Macfarlane, J.
Plaintiff sues for damages on account of personal injuries by being struck by a train of defendant, on a public crossing in Vernon county. The petition is in two counts. The first charges negligence generally in running and managing the train. The second charges negligence in permitting an embankment to remain upon its right of way and suffering weeds to grow thereon, thus obstructing plaintiff’s view of the track as she approached it. The answer is a general denial and a plea of contributory negligence. The plea charges that plaintiff negligently drove upon the track without taking any precaution to ascertain whether the train was approaching.
A trial resulted in a judgment for plaintiff for $6,000 from which defendant appealed.
On the trial defendant objected to the introduction of any evidence, on the ground that neither count of the petition stated facts sufficient to constitute a cause of action. The objection to the first count was that a mere general charge of negligence was not a statement of facts required by the code. To the second count the objection was made that obstructing the view of the *368 track at a crossing was not actionable negligence. It will not be necessary to consider these objections.
The evidence shows that defendant’s railroad runs into the city of Nevada from the southeast, and that a public road running north and south crosses it at an angle of about forty-five degrees. At the time of the accident, September 13, 1892, on the north of the railroad right of way, and east of the public road, was a field of corn. The railroad .track from the southeast approached the public road in a cut for a distance of about four hundred and twenty feet. The cut immediately east of the crossing was about three and one half feet below the natural surface of the ground. Further east it acquires a depth of four and one half feet and gradually lessens to the end. In making this cut the dirt had been deposited on the right of way, about twenty-five feet north of the track. Upon the embankment thus formed was a growth of weeds and grass. The public road was sixty feet wide, and the embankment extended up to this road. This embankment twenty-one feet from the center of the public road, was two feet above the natural surface of the ground. Forty-six feet further east it was about three feet, which was the highest point. The average to the end of the cut was about two feet. There was no evidence that weeds grew between the railroad and the embankment. The railroad was practically straight, having a curve of only three degrees to the south. All witnesses who had knowledge testified that the corn in the first place, and the embankment and weeds afterward, greatly, if not wholly, obstructed the view of the track to the southeast, and a train thereon, to a traveler on a public road, approaching the railroad from the north, could not be seen until after he had passed the embankment which was twenty-five feet from the track.
*369 The county surveyor who was called as a witness by plaintiff, testified that he had taken measurements and observed approaching trains, and a person standing in the public road, or seated in a buggy, at a point twenty-five feet from the railroad, and, at any point between that and the crossing, had an unobstructed view of the track toward the southeast for a fourth of a mile; that this was the case regardless of the height of the embankment and weeds thereon. The evidence of this witness was corroborated by others and contradicted by none, unless that of plaintiff. The view of the railroad to the northwest was unobstructed at any point after the right of way was reached.
On the thirteenth day of September, 1892, plaintiff drove along this public road from the north on her way from Nevada to her home. She was driving a gentle and tractable horse, which was accustomed to trains and was not frightened by them. She had been over this crossing several times before, though this was not her usual road from Nevada to her home. As her horse stepped upon the- track he was struck by a passenger train from the east and killed, the buggy was torn up and plaintiff severely injured. There was some evidence tending to prove that the required statutory signals were not given in approaching this crossing.
Plaintiff testified as a witness on the trial; and as her right to recover depends largely on her own evidence, and as it is somewhat indefinite, we quote largely from it, as it bears on the question of contributory negligence. She testified in chief:
“I had been to Nevada and had done my errands and was returning home rather earlier than common and had some cattle that I wanted to sell and I took that south road; I have traveled that road before, and. this time I wanted to go that way, and I was traveling along slow and I was watching and looking for the *370 train, and I first looked toward the east and there was an obstruction there and I couldn’t see anything or hear any noise, and I went very slow and stopped my horse for a moment or so, and he walked all the way; I don’t think he trotted at all, and I was watching for the train, and when I got — I don’t know how far' from the crossing — it wasn’t very far, I looked toward Nevada to see if I could see the train, and that was all clear. I couldn’t see anything there, and by that time the train was coming down very fast, and my horse had got his feet up on the track and the engine ran against him.”
On cross-examination, after testifying that the first stop was two hundred or three hundred feet from the track, she testified:
“Q. So, when you first stopped, the corn obstructed your view in that direction? A. Yes, sir. # # * * * #
“Q. Then, you say, you went on toward the track? A. Yes, sir.
“Q. Did you stop your horse again — stop him still? A. Yes, sir; I did.
“Q. Now, where was that? A. That was pretty near to the track; it was nearer to the track.
UQ. Had you got past the corn when you stopped the second time? A. I don’t know whether I had or not. I don’t know whether it was the corn or the weeds that obstructed the view of the cars. I know that when I got right close to the track his head was right up to it; that I looked toward Nevada, and I couldn’t see anything that way, and I looked the other way and here was the cars coming right on me.
“Q. You say that the first time you stopped was out where the corn obstructed your view? A. Yes, sir.
“Q. And then you stopped again still? A. Yes, sir.
*371 “Q. How far was that from the track? A. Just a few feet.
“Q. Well, how far? A. Well, four or five or six feet.
“Q. Did you come to a full stop? A. Yes, for a minute.
“Q. Then you looked to the west and didn’t see any train? A. Yes, sir.
“Q. And your horse at that time was not on the track? A. He had gone on again; he started on again.
“Q. Let’s get at that. I believe you say that you stopped four or five feet from the track, and your horse came-to a full stop. Is that correct? A. Yes, sir; he just stopped for a minute.
“Q. Did he come to a full stop? A. Yes, sir.
‘ ‘ Q. Did he stop long enough for you to look in each direction? A. I looked as he was going, and then he stopped. Then he started up again on a walk, and when his feet got on the rails he was struck.
“Q. When your horse stopped, what did you do then? A. I looked for the cars.
“ Q. Which way did you look? A. Both ways.
“Q. And you say that you were within four or five feet of the track? A. Yes; that was the second time. I looked toward Nevada and could not see anything, and I would have looked toward the other way, but I didn’t have time.
“Q. Now, then, wasn’t your horse moving on at that time? A. He was going very slow, I say, after I stopped him a minute there.
“Q. When you got within a few feet of the track, did you ever stop your horse at all long enough to look east? A. Yes, sir.
*372 11Q. Did you look east while your horse was standing still, before he got on the track? A. I tried to, but I couldn’t see anything.
“Q. Do you say that you could not have seen east a quarter of a mile when you were within fifteen or twenty feet from the track? A. I didn’t see anything.
UQ. Was there' anything to obstruct your ¡view for a quarter of a mile when you got within fifteen or twenty feet of the track? A. I think the embankment and the weeds would do it.
“Q. Is it not a fact that, regardless of the embankment and the weeds, that within twenty feet of that track you could have stopped your horse and seen up and down the track for a quarter of a mile each way? A. I know that I didn’t see anything, and I was watching and listening all the while. I didn’t see anything.
“Q. Isn’t this true, that you were driving along and drove on this track, looking to the west as you drove on to it, and before you had time to look to the east the train was right on to you? A. I had looked to the west first to see if I could see anything, and I could not, and by that time the horse was moving on.
“Q. Then your horse didn’t stop long enough for you to look west and then look east? A. Well, he was on the track.
“ Q. Before he got on the track? A. I did look both ways there while he was standing still or going very slow on a walk.
“Q. What I want to get at is this: When he stopped, he did not stop long enough for you to look in both directions? A. Yes, when he first stopped.
“Q. I mean the last time, near the track there? A. Yes, I looked both ways.
“Q. When you were near the track? A. Yes, sir.
*373 “Q. And you think you were within four or five feet from the track! A. Yes, when he stopped that time, and when he went on and got on the track.
“Q. Now, are you not mistaken about that, and is it not true that you didn’t get to look east at all when the horse was stopped! A. No, sir; I tried to look.
“Q. You think that you were within a few feet of the track! A. I think I was. I was awfully hurt, and forgot everything almost at the time, and I can’t say just how far I was, but that is what I think.
liQ. When you got to the track how many times did you look east! A. I don’t know how many times. I was watching.
“Q. You can’t say how many times you looked east When you got to the track! A. No, sir; I can’t say.
“Q. Did you look more than once! A. Yes, sir; I looked first one way and then the other.
UQ. How long did your horse stop! A. A few seconds; I can’t say how long. He didn’t stop very long.
“Q. Your horse was moving at the time you looked around, and the train was right on you! A. Yes; by that time he had got to the track.
“Q. He had got on the track! A. Yes, with his fore feet.
“Q. Couldn’t you have stopped within a few feet of the track and seen the train down the track a quarter of a mile, notwithstanding the embankment and the brush! A. No, sir.
“Q. You think not! A. No, sir.”
At the conclusion of all the evidence the defendant asked a peremptory instruction directing the jury to find for defendant. This the court refused.
We are of the opinion that this appeal will have to be disposed of on the question of contributory negli *374 gence. For the purpose of this question we may assume that the employees of defendant did not give the required statutory signals and in this respect defendant was negligent.
The duty of a traveler upon a highway, in approaching a railroad crossing, to use all reasonable precautions to ascertain the approach of trains and to avoid injury by them is well • settled law, not only in this court, but perhaps of all the courts of this country. This rule imperatively requires him to look carefully, in both directions, at a convenient distance from the crossing, before venturing upon it, if, by looking, a train could be seen. The duty will not be performed by attempting to look only from a point at which the view is obstructed. The duty is a continuing one until the crossing is reached. If there is a point between the obstruction and the track which gives opportunity to see, it is the duty of the traveler to look. He can not close his eyes and thereby relieve himself of the consequence of his own neglect. Hayden v. Railroad, 124 Mo. 566.
Plaintiff recognized these principles, for she says she stopped twice and looked and listened. The first stop was two hundred feet from the crossing and it is conceded that from that point she could not have seen the train from the southeast, on account of the corn in the field and the embankment and weeds upon the north side of the right of way. The question then is, whether there was a point, after these obstacles were passed, and before the crossing was reached, at which she could have seen the train and avoided the collision.
The evidence is conclusive that the embankment was not nearer the track than twenty-five feet on the north and extended west about to the line of the county road. There were no weeds or other obstructions between this embankment and the railroad toward the *375 southeast. The railroad was substantially straight. It is therefore established by these undisputed physical facts that plaintiff had, for a space of twenty-five feet, an unobstructed view of the track for some considerable distance, and a space in which she could have safely waited, with a gentle horse, such as she was driving, until a train passed. It was also shown that the road ran in a cut, four feet deep next the highway, for a distance of about four hundred feet. This distance at least plaintiff could have seen along the road. But the county surveyor testified, after making measurements, and taking observations, that a-train could have been seen and in fact it was seen by him, a fourth of a mile from this point.
Counsel insists that the evidence is contradicted by that of plaintiff and the question was properly submitted to the jury. But we do not think the evidence of Mrs. Kelsay contradicts that of the surveyor and other witnesses as to any of these physical facts. It is true she says that when within a few feet of the crossing she could not have seen a train a quarter of a mile down the track. That she looked first one way and then the other. That she was watching. That she tried to look, but could not see anything. The second stop she says was made from four to five feet from the track. The horse stopped for a minute (or a few seconds) and then started up again in a slow walk and when his feet got on the rail he was struck. When she stopped the second time she looked towards Nevada and could not see anything, and she could have looked the other way, but did not have time. “I looked toward Nevada and could not see anything that way, and I looked the other way and here was the cars coming right on me.” There is no contradiction of the fact that the embankment was twenty-five feet north of the track, and there was no obstruction to the view of the track between *376 that and the crossing. But she does say that she looked and did not see the train. It does not clearly appear from what point she looked when she could not see, but it does appear that she did not look from the point of her second stop until the horse had gone, and his feet were upon the track.
But even conceding that she testified that she looked east for a train as soon as she had passed the obstruction, it is clear that the train was in plain view and within two hundred or three hundred feet of the crossing. One of two facts is true: Either the plaintiff did not look with that care common prudence required of her, or she did not look at all, until too late to avoid the collision.
It was said in a recent case: "It is simply and flatly impossible that one can stop, look, and listen for an approaching train that is in plain view and close at hand and be unable to see or hear it, if he possesses the senses of sight and hearing. It seems, therefore, necessary to advance one step in the application of the doctrine of legal presumption, and to lay it down as a rule that one who is struck by a moving train which was plainly visible from the point he occupied when it became his duty to stop, look, and listen, must be conclusively presumed to have disregarded that rule of law and of common prudence, and to have gone negligently into an obvious danger. A line of well considered cases leads fairly up to this conclusion. ” Myers v. Railway, 24 Atl. Rep. 747.
"If a traveler, by looking, could have seen an approaching train in time to escape, it will be presumed, in case he is injured by collision, either that he did not look, or, if he did look, that he did not' heed what he saw. Such conduct is held negligence per se.’} Beach, Cont. Neg. [2 Ed.], sec. 182.
*377 “It is in vain to say that he looked and listened, if, in despite of what his eyes and ears must have told him, he walked directly in front of a moving locomotive.” Carroll v. Railroad, 12 Wkly. Notes Cas. 348; Marland v. Railroad, 16 Atl. Rep. 623.
“A man may possibly think he sees an object, which has no existence in fact, but which it may be difficult, if not impossible, to prove did not exist or was not seen. But an object and power of sight being conceded, the one may not negative the other. In this case the plaintiff had good eyes; the train was approaching him in the night, with the engine’s headlight burning brightly; if the plaintiff looked, he must have seen it, or he must have looked very negligently and carelessly — in either case, he was necessarily, in the eyes of the law, guilty of contributory negligence, precluding his right to recover.” Artz v. Railroad, 34 Iowa, 153.
“It was broad daylight, and when within five feet of the north rail of the track it is undisputed that the plaintiff Gould see two hundred and fifty feet east along the main track. No one disputes that if he had but looked he certainly would have seen the train. It is evident, therefore, that he did not look; or, if he did, he saw the train, and carelessly attempted to cross in front of it, and in either case he was guilty of such negligence as to preclude a recovery. * * * If he had looked eastward, he would have seen the train before he stepped upon the track. * * * One look eastward, and one less step taken, he would not have been upon the track. Upon any theory of the case, it was the duty of the court to have directed the verdict in favor of the defendant.”. Gardner v. Railroad, 56 N. W. Rep. 603.
It was said in a recent case in this court, by the present chief justice: “It will thus be seen that it was *378 a physical impossibility for the deceased to have failed to see the approaching train, if he looked in that direction, as it was his duty to do, while yet in a place of safety, and before entering upon the line of danger. Had he done so, there can be no question that he could, and would, have stopped his team until the train passed, and then crossed over in safety. But for some unexplained reason he failed to do so. And thus it is, though the defendant may have been negligent in failing to give the signals for the crossing, and in permitting the high grass to be upon its right of way, yet the deceased having lost his life through his own negligence in failing to discharge the duty imposed upon him by law, in his situation, the plaintiff can not recover for his death.” Hayden v. Railroad, 124 Mo. loc. cit. 573.
Plaintiff says her eyesight was good. Á view of the track for a quarter of a mile was unobstructed from any point within twenty-five feet of the track. When the. obstruction was passed the train was within three hundred feet of the crossing in plain view. It is in vain for plaintiff to say that she looked, with any degree of care, and did not see it. In any event we can but say that plaintiff was negligent and that her negligence contributed to her own injury. After a careful examination of all the evidence, and allowing every reasonable inference in favor of plaintiff, this conclusion is irresistible.
This ruling does not disturb in the least the decision of this court in Kenney v. Railroad, 105 Mo. 270, which we think correctly decided. A comparison of the facts in the two cases will clearly demonstrate the difference between them. Judgment is reversed.
All concur.