### In re RALPH.

(District Court, D. Minnesota, Fourth Division. October, 1923.)

1. Bankruptcy ⬤═➤340—Claim may be rejected, though supported by testimony not directly contradicted.

A referee is not bound to accept the testimony of a claimant in support of a claim filed, though uncontradicted, where the circumstances are such that direct contradiction is impossible, but should examine it in the light of all the facts and circumstances developed in the case which may affect the credibility of claimant and the value of the testimony, and may accept or reject it.

2. Bankruptcy ⬤═➤340—Claim held not supported by credible evidence.

Testimony of the wife of a bankrupt in support of her claim to wages for services rendered as a clerk in bankrupt's store under an oral contract of employment held inconsistent with facts shown by other evidence, and insufficient to sustain the claim.

⬤═➤For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

3. **Bankruptcy** ⬤⟹225—**Referee should limit testimony to pertinent matters.**

On hearings before a referee, he should limit the examination of witnesses to matters pertinent to the issues which are contested.

4. **Bankruptcy** ⬤⟹229—**Contempts before referee.**

Improper conduct or misbehavior of counsel in proceedings before a referee should be stopped by him at once, and if his order is disobeyed he should discontinue the hearing and certify the matter to the court, under Bankruptcy Act, § 41b (Comp. St. § 9625).

5. **Bankruptcy** ⬤⟹407(5)—**Discharge not denied for concealment of claim in statement to creditors, where claim disallowed.**

Recommendation of special master that discharge be denied, on ground that bankrupt had concealed in his financial statement to creditors claims for services of his wife and children, will not be sustained, where it has been determined that the claims are not provable claims.

In Bankruptcy. In the matter of Aaron Ralph, bankrupt. On review of order of referee allowing the claim of Sophie Ralph, and on exceptions by bankrupt to report of special master recommending denial of discharge. Order of referee reversed. Exceptions to report of special master sustained, and the application for discharge recommitted for further hearing.

In addition to the exceptions mentioned in the memorandum of the court, the bankrupt excepted to that part of the report of the special master, dated and filed on August 6, 1923, recommending that the discharge of the bankrupt be denied on the ground that he made a false statement in writing of his financial condition to Lindeke, Warner & Sons, in this: That he omitted therefrom any mention of an indebtedness due and owing to his wife, amounting to $4,625, for salary as a clerk in his store on West Lake street, in the city of Minneapolis, Minn., and also in omitting any mention of indebtedness to his children in the sum of $7,176.69 for money borrowed from them to pay his creditors on November 12, 1920.

Allen & Fletcher, of Minneapolis, Minn., for trustee.

Victor Petersen and R. S. Jones, both of Minneapolis, Minn., for claimant.

Victor Petersen, of Minneapolis, Minn., for bankrupt.

Clark R. Fletcher, of Minneapolis, Minn., for Lindeke, Warner & Sons.

McGEE, District Judge. The question presented by the record in this case is one of fact. Aaron Ralph, the bankrupt, and Sophie Ralph, the claimant, husband and wife, with a family of three small children, removed to Minneapolis from Chicago in the year 1916. It appears from the testimony of Sophie Ralph that, while in Chicago, her husband had trouble with his creditors, the exact nature of which is not disclosed by the evidence. On or about the 20th of December, 1916, the bankrupt commenced business as a merchant dealing in dry goods and gentlemen's furnishing goods at 301 West Lake street, about three miles from the business center of the city of Minneapolis, and continued in business at that point until April, 1922, when he filed a voluntary petition in bankruptcy.

The claimant presented a claim against the estate of the bankrupt for $5,928.55 for wages, which she claims to have earned working as a clerk in the store of her husband, beginning on December 20, 1916, and ending with the bankruptcy of her husband in 1922. The claim rests upon a contract which the claimant asserts she entered into with her husband in December, 1916, when he commenced business at 301 West Lake street. It is claimed that under this contract she was to receive $75 per month, and after working one year that the rate of wages was increased to $100 per month, making the aggregate amount due her to January 8, 1922, according to her statement of claim filed with the referee and allowed herein, $5,928.55.

The question is whether any such contract was ever made, and that question must be answered by a consideration of all the facts and circumstances surrounding the transaction and the parties connected therewith. The claimant has testified positively that such a contract was entered into, and no witness has contradicted her testimony on that point, and could not well have done so, because the claimant fixed the transaction at a time and place when only herself and her husband were present, making direct contradiction impossible. If the story is a pure fabrication, it would be more difficult for two persons than for one, testifying in regard to the transaction, to withstand cross-examination in relation thereto.

Throughout the trial it was assumed that subdivision 1 of section 8375, General Statutes of Minnesota 1913, governed in the examination of witnesses before the referee. That statute, so far as is pertinent here, reads:

"A husband cannot be examined for or against his wife without her consent, nor a wife for or against her husband without his consent, nor can either, during the marriage or afterwards, without the consent of the other, be examined as to any communication made by one to the other during the marriage."

The claimant was asked to waive the provisions of the statute and permit her husband, the bankrupt, to be examined with reference to the making of the alleged contract upon which her claim rests; but she promptly and positively refused to do so. Thereafter during the trial her counsel objected, and the referee sustained his objections, to every question that contained even a mention of the bankrupt's name.

[1] The testimony of the claimant not having been directly contradicted, the referee apparently felt compelled to accept it as true, when he ought to have examined it in the light of all the facts and circumstances developed in the case, affecting the credibility of the claimant as a witness and the value of her testimony, and then have reached a conclusion, accepting or rejecting the same. The case is here on a petition of the trustee for a review of the order of the referee allowing the claim.

[2] In determining the value that should be placed upon the testimony of the claimant, the fact that she fixed the making of the contract under circumstances that make direct contradiction impossible is an element to be considered, as well as the fact that she elected to take a course that she was not bound to take, but which she had the techni-

cal legal right to take, of standing on the letter of the law, which made it impossible to examine her husband with reference to the transaction. I have read the testimony in the case several times, and have given it very close attention, particularly that of the claimant, which, from the very first to the last time she was called to the stand to testify, is in the highest degree noncommittal, equivocal, shifty, and evasive, and to my mind is self-contradictory and inherently improbable. The impression abides with me, after the most careful thought I have been able to give to the matter, that it was and is, in all essential particulars, false.

It is well settled that a court is not bound to accept the testimony of a witness as true, because not directly contradicted, if, examined in the light of all the facts and circumstances disclosed by the evidence in the case, and the character of the testimony itself, and the manner of the witness in testifying, and his interest in the outcome of the litigation, the court is satisfied that it is untrue or is not satisfied that it is true. A case very much in point is Thompson v. Pioneer Press Co., 37 Minn. 285, 289, 33 N. W. 856, in which the court said:

"The theory of the plaintiff rests upon his own testimony alone. If the explanation which he gives is not true, the inference of his own guilt, to be drawn from the undisputed facts of the case, is wholly unopposed. In general, disputed questions of fact must be submitted to the jury; and the jury is to judge of the credibility of witnesses. But, after a studious examination of this extraordinary case, the majority of the court is undoubtingly of the opinion that the testimony of the plaintiff upon this subject, and the theory upon which alone he rests, are entirely unworthy of credit, and should not be accepted by any court or jury as the basis for a verdict."

In M., K. & T. Ry. Co. v. Collier (C. C. A. 8) 157 Fed. 347, 353, 88 C. C. A. 127, 133, the Thompson Case is cited, approved, and followed. The court said:

"The plaintiff introduced a witness named Bogard, whose residence was about 300 feet from where the conductor and the switchmen were occupied about the detached engine and cars, who, remarkably enough, chanced to be outside of his house at that hour of the night. He testified that about the time of the coming of the passenger train he observed the up and down motion of a lantern over towards the south switch of the main track. As the cars on the house track stood between him and the main track, the physical facts render his testimony too utterly incredible for any court to suffer it to be the basis of a verdict and judgment. Where a witness' testimony is positively contradicted by the physical facts, neither the court nor jury can be permitted to credit it. Gurley v. Railroad, 104 Mo. 211, 16 S. W. 11; State v. Dettmer, 124 Mo. 426, 27 S. W. 1117; McLachlin v. Barker, 64 Mo. App. 511; Kelsay v. Railroad, 129 Mo. 362, 30 S. W. 339; Huggart v. Railroad, 134 Mo. loc. cit. 676, 36 S. W. 220; Payne v. Railroad, 136 Mo. 583, 38 S. W. 308; State v. Gurley, 170 Mo. loc. cit. 432, 70 S. W. 875; Petty v. Railroad, 179 Mo. 666, 78 S. W. 1003; Waters-Pierce Oil Co. v. Van Elderen, 137 Fed. 557, 70 C. C. A. 255."

According to the claimant, the contract in question was entered into on the day her husband opened his store for business on December 20, 1916, with the following dialogue:

"He says to me, 'Will you work for me now?' because I always did work when we lived in Chicago for other people. And he says, 'Will you work for me now?' and I says, 'I will, if you pay me.' He said, 'I have got to pay you as well as a stranger,' because, he said, 'I could trust the store quicker to you

than anybody else;' so I said, 'All right,' and he said he would give me $18 a week; that would be $75 a month, and I said, 'All right,' I would do that."

The testimony of the claimant is that, working from the 20th of December, 1916, until the spring of 1922, she never received one penny of compensation from her husband, although she repeatedly demanded it from him, and this in the face of the fact that his money was passing through her hands every day. She first testified that he agreed to pay her after his bills were paid, and finally changed her testimony so that she was to be paid after he sold his business. She testified at first that she kept the account in a little book, which she later changed to a pad, and then to a piece of cardboard, which at first she admitted that she had in her attorney's office, when she made out her claim in this matter, and then denied its existence or alleged its destruction. Her testimony in regard to a remarkable episode which appeared in evidence in the case is alone sufficient to brand it as unworthy of credit, and that is the matter of a deposit made in her own name in the savings department of the First National Bank of Minneapolis, Minn., and then switched into the name of her little girl, amounting on the 8th of November, 1920, to $7,176.69.

The bankrupt's business, so far as the facts are disclosed by the evidence of the claimant and the bankrupt, improved and prospered from the day the store opened until in October, 1920, when the claimant testified that one night in that month, at 9:30 o'clock, when her husband was not present, robbers entered the store and took from the till its contents, amounting to $203. There was no proof of any such robbery, outside of the unsupported testimony of the claimant. In the same month it is claimed by the bankrupt that robbers made a second visit to his store, and through the back door took away several wagon loads of merchandise, which amounted in value to several thousand dollars; that no inventory or other means were taken to establish the amount of the loss, if any such burglary in fact took place, and there is no evidence that it did take place, outside of the unsupported testimony of the bankrupt. About this time four of the creditors, with claims aggregating about $7,000, apparently became very suspicious of what was going on in connection with the bankrupt's business, and began to press for payment of their claims, which resulted in the bankrupt executing a trust deed transferring his property and business to a trustee for the benefit of the 4 of 58 of his creditors, holding indebtedness to the amount mentioned.

At this time an inventory was taken by the trustee, and within a day or so it was discovered by the creditors mentioned, or the trustee, that there was a deposit in the savings department of the First National Bank of Minneapolis to the credit of a 16 year old daughter of the bankrupt, amounting to $7,176.69, which was at once reached by the creditors mentioned by garnishment proceedings, and, apparently on the advice of his or their attorney, it was promptly turned over by the bankrupt, the claimant, and their daughter to the creditors in payment of their indebtedness, and all this unknown to the other 54 creditors, and without any claim having been made by the claimant that she was

then a creditor to the extent of about $4,000, and without any attempt to resist the appropriation of the deposit to the payment of the creditors on the ground that it was not the property of the bankrupt, but was a trust fund created by the claimant's father for her children, born and to be born. At this point, the episode referred to may be considered, and, if the claimant's testimony is false with reference thereto, then the court would be justified in disregarding it for all purposes.

The claimant, in attempting to account for the origin of the deposit of $7,176.69 to the credit of her daughter, testified to this remarkable story: That in 1910 or 1912 or 1914, in the city of New York, in her father's bedroom, when no one else was present but herself and her father (now deceased), he handed to her $6,500 in currency, and told her to keep it to some indefinite time in the future, and then distribute it, in what proportions was not stated, to her children, born and to be born, and that that identical currency was the currency with which she opened the account at the savings department of the First National Bank of Minneapolis, on the 19th of October, 1917, in her own name, and later switched it into the name of her child, Florence, on the 11th of September, 1918.

The following is the testimony of the claimant as to the custody of this package of currency from 1910 or 1912 or 1914. The fact that the claimant does not seem to be able to state within four years of the exact time of the receipt of this money from her father is most remarkable:

"Q. You said that, after you opened the account in the name of Florence Ralph, you did not put the whole sum of $7,000 in there at once? A. No; I didn't. But I didn't open the account myself.

"Q. How much money did you put in the account of Florence Ralph when you opened it? A. I don't remember.

"Q. The money you put in that account, where did it come from, from your personal possession, or from the store? A. It was the children's money.

"Q. Where did it come from? A. I kept their money.

"Q. Where did the actual bills that you took down and put in the bank—where did they come from? A. From my stocking.

"Q. Did you have a stocking at home that you kept this money in? A. Yes; at home.

"Q. You didn't wear a stocking, or have money in the stocking while you were wearing it? A. Sometimes I would; it was according to where I went.

"Q. Did you carry around $6,500 in bills in your stocking? A. Yes; I did.

"Q. For five or six years? A. Ten years.

"Q. Ten years? A. Yes.

"Q. You carried it wherever you went? A. I changed my stocking, sure.

"Q. Did you ever leave this $6,500 at home? A. Sometimes; yes.

"Q. When you left it at home, where did you put it? A. I don't think I would like to tell where I put it.

"Q. Where? A. Well, there was different places. I put it in the flour; put it in the salt; put it in such places.

"Q. Was this $6,500 in an envelope? A. It was in my stocking.

"Q. Was it loose in bills, or an envelope, or pocketbook? A. I used to roll it in paper.

"Q. How many thousand dollar bills were there in this money? A. None. I don't think there were any $500 bills. The largest I think was $50.

"Q. And those were the same bills your father gave you? A. Those were the same bills my father gave me.

"Q. And you kept them for many years? A. Many years; ten years I think.

"Q. Before you ever put them in the bank? A. Yes.

"Q. Now, the money that was put into the bank in Florence Ralph's name came from where? From that $6,500? A. Certainly.

"Q. Why was it, then, that you didn't put the whole $6,500 in at once? A. I am sorry that I put it in ever, because, if I didn't, I would have that to-day. Mr. Ralph coaxed me to put that money in the bank, because it would draw interest.

"Q. Were there any pennies, nickels, and dimes in that $6,500 that your father gave you? A. Not when he gave me, but you know I have been trading with that money. I was lending it in Chicago, and they would give me a little interest on it.

"Q. Then you didn't keep the $6,500 in your stocking all the time? A. Yes; I did keep it.

"Q. Well, how could you lend any part of the $6,500 and keep it in your stocking, too? A. I did. I lent $50.

"Q. Who did you lend $50 to? A. Chicago—to some neighbors.

"Q. Who were they? A. There was one named Mr. Katz.

"Q. What is his first name? A. I don't know.

"Q. Where does he live? A. I don't know where he lives now.

"Q. You don't know Mr. Katz's first name? A. No.

"Q. You don't know when you loaned him that money? A. That was about eight years ago.

"Q. Did he give you a note? A. No; he didn't.

"Q. Do you know what his address was? A. I don't know.

"Q. How did he spell his name? A. I don't know.

"Q. Who else did you loan any part of the $6,500 to? A. Another man, $50.

"Q. When? A. I don't know; seven or eight years ago; eight or nine years ago.

"Q. What was his name? A. His name was Kohen. I don't know how he spells it. I don't know his first name. He lived on Forty-Seventh street in Chicago. I don't know his address. He did not give me a note. It was the interest on those loans which accounted for the small change.

"Q. Did you deposit odd amounts of money to the account of Florence Ralph? A. I don't remember."

Several months later the claimant was further cross-examined in regard to her custody of this alleged fund during the course of ten years, and testified as follows:

"Q. Now, was this money wrapped in a bundle, a round roll, or was the money bound around your limb, the paper bills remaining flat? A. They were not flat either. They were folded like this (indicating with paper, folded lengthwise), about like that.

"Q. You have exhibited to me a proof of claim filed in this matter by the Lindeke-Warner Company. That proof of claim is about three inches in diameter. Do you mean a roll of bills of any such size as that?

"Mr. Petersen: She didn't say it was as large as that. A. I did not get your question. I don't understand the question.

"Mr. Petersen: He is just trying to throw you off. Watch out what you are doing and saying.

"Q. You have showed me this roll? A. Yes.

"Q. Do you mean that the roll of bills was shaped like that, or was it that size? A. No; it was not that size. It was smaller. I said it was smaller in the first place.

"Q. Well, how big was it? A. Oh, I don't know just exactly.

"Q. Was it as big around as your fist? A. I really can't tell you. I had it in two rolls. It is a little bit shorter, I think; yes, it would be. I would lay them all out, see, in two rolls.

"Mr. Petersen: Two rolls of bills? A. Yes; and put half on each leg, you know. I would never count it; just the same amount in each. That didn't make any difference to me, and I bound them, I rolled them up like in a handkerchief, and rolled them around like this, and tied it right around my leg (indicating just below knee), and then they wore those long dresses and it didn't show.

"Q. This money was all in paper bills? A. Yes.

"Q. And you would divide it into two packages? A. Two packages, yes; two bundles. ·

"Q. Then you would fold those bundles or roll them? A. You know, like this.

"Q. Just show us. This record has got to go to the judge, and I want it in the record. A. I don't know whether you say 'roll,' or 'twist,' or what. Well, roll would be this way. I said I didn't have them this way (folded lengthwise), and then I would bend them over like that (folding lengthwise), and tie them around.

"Q. So you would roll them lengthwise?

"Mr. Petersen: Fold them. A. I would roll them this way (indicating folding lengthwise).

"Q. And when you got it rolled that way, then you would bind it about your leg? A. Yes, sir.

"Q. What did you hold it on your leg with? A. Then I would take it—I will show you just what I would do. I have this handkerchief here for instance. This is entirely too large, you know; that is too big. I would put the money on, and then I would take the handkerchief this way, and tie it on top. Then I would put my bloomers over it.

"Q. You would bind it onto your limb with a handkerchief? A. Yes; a handkerchief. I used to bind it around there twice, and tie it.

"Q. Now, you say both limbs are deformed from doing as you did? A. Yes, sir."

It will be noted that the plaintiff, in her first testimony given in August, 1922, testified that during the years mentioned while the money was in her personal custody she kept the $6,500 in a stocking, without indicating that when so filled with money the stocking was worn on her limb; then she changed to a paper wrapping, and finally to a handkerchief, and from having it at first lashed to one limb, to a division of the roll into two packages of equal size, strapped to her two lower limbs, and when not strapped to her limbs, she testified it was buried in the family flour and salt.

The claimant's testimony excludes the idea that there were any bills in the package of a denomination in excess of $50, but she thinks that there were some of that denomination. An examination of the bank account in which this currency was deposited shows there must have been bills of the denomination of $1 or $2, and $5 or $10, and possibly $20. It probably would be a fair proposition to assume, for the purposes of illustration, that there were 10 bills of the denomination of $50 each, and that the balance was equally divided into three packages of equal amounts, and of the denominations of $5, $10, and $20. If that supposition were approximately correct, there would be 10 bills of the denomination of $50 each, 100 of the denomination of $20 each, 200 of the denomination of $10 each, and 400 of the denomination of $5 each, or 710 bills.

Taking the witness' last version of the manner in which she bound the same to her limbs, assuming that the binding was done to the two

limbs, instead of one, there would be 355 bills strapped to each limb, but she says they were folded lengthwise, so that there would be two thicknesses to each bill, and that would be the equivalent of the thickness of 710 bills to each limb. Seven hundred and ten bills, new, laid one on top of the other and strapped together for shipment, as banks ship money, make a package 5½ inches in height or thickness, and weigh 2¼ pounds. Dividing the same into two packages, of 355 bills each, folded lengthwise, we would still have 710 thicknesses, or two packages of bills, each 5½ inches thick, and weighing 1⅛ pounds, which the witness would have the court believe were strapped one around each of her lower limbs below the knees, and which, if her limbs were small enough, so that the roll would go half way around the limb, would, measured from end to end through the limb, add 11 inches to the thickness of each limb.

The spectacle of a person, on her limbs constantly and using them every day for ten years, in the condition indicated, must have attracted attention. Whether it would be practically possible to have such a thing occur is quite another question, and apparently created doubt in the mind of the claimant's counsel, and probably had its influence in suggesting the resort in this case to medical testimony, which appears in the record transmitted by the referee to the effect that the claimant is "bow-legged." The whole thing is so preposterous that it is hardly complimentary to a court to have it thought that judicial credulity and gullibility could exist to an extent that would make possible the acceptance of such a story as true.

When on the witness stand the claimant could see, from the turn the examination was taking, that it was going to become difficult to reconcile her statement that she received $6,500 in currency from her father many years before, and kept it intact on her person for ten years until she deposited it in the savings department of the First National Bank of Minneapolis in 1917 or 1918, with the amount of the deposit, $7,176.69—a difference of $676.69—so she, without much opportunity for thought, improvised an explanation to the effect that the increase in the fund resulted from interest earned. There apparently was not time to work out the details of an adequate explanation, and all the claimant could say was that she made two loans of $50 each when she lived in Chicago, some eight years before, without taking any notes therefor, to neighbors named Katz and Kohen, whose names she was unable to spell, whose first names and addresses she did not know, loans that apparently, from the testimony, were closed up long since, and if they actually had been made, as she says, eight years before, and had borne 6 per cent. interest per annum to date, would only have earned $6 per year, or $48 for the period, and would fall far short of accounting for the increase of $676.69 deposited in the bank over and above the amount that she claims her father gave her.

The following are copies of the Sophie Ralph and Florence S. Ralph accounts from the books of the savings department of the First National Bank of Minneapolis, Minn.:

Sophie Ralph. No. 50578.

| Date. | Withdrawn. | Interest. | Deposit. | Balance |
|---|---|---|---|---|
| Oct. 19, 1917 | | | $500.00 | $500.00 |
| Dec. 26, 1917 | | | 170.00 | 670.00 |
| Apr. 1, 1917 | | $5.86 | | 675.86 |
| May 6, 1918 | | | 40.00 | 715.86 |
| May 25, 1918 | $150.00 | | | 565.86 |
| June 13, 1918 | 100.00 | | | 465.86 |
| July 1, 1918 | | 4.07 | | 469.93 |
| Sept. 11, 1918 | 469.93 | | | 000.00 |

Trustee's Exhibit B.

Florence S. Ralph. No. 55086.

| Date. | Withdrawn. | Interest. | Deposit. | Balance |
|---|---|---|---|---|
| Sept. 11, 1918 | | | $582.00 | $ 582.00 |
| Sept. 11, 1918 | | | 469.93 | 1,051.93 |
| Oct. 1, 1918 | | $4.10 | | 1,056.03 |
| Nov. 2, 1918 | $ 50.00 | | | 1,006.03 |
| Dec. 27, 1918 | | | 500.00 | 1,506.03 |
| Jan. 1, 1919 | | 8.80 | | 1,514.83 |
| Mar. 17, 1919 | 250.00 | | | 1,264.83 |
| Apr. 1, 1919 | | 11.06 | | 1,275.89 |
| Apr. 21, 1919 | | | 100.00 | 1,375.89 |
| May 6, 1919 | | | 100.00 | 1,475.89 |
| May 12, 1919 | | | 100.00 | 1,575.89 |
| May 31, 1919 | | | 121.00 | 2,096.89 |
| June 9, 1919 | | | 100.00 | 2,196.89 |
| June 24, 1919 | | | 225.00 | 2,421.89 |
| July 1, 1919 | | 11.16 | | 2,433.05 |
| July 1, 1919 | | | 150.00 | 2,583.05 |
| July 7, 1919 | | | 400.00 | 2,983.05 |
| Aug. 26, 1919 | | | 150.00 | 3,133.05 |
| Sept. 9, 1919 | | | 100.00 | 3,233.05 |
| Sept. 12, 1919 | | | 100.00 | 3,333.05 |
| Sept 18, 1919 | | | 55.00 | 3,388.05 |
| Oct. 1, 1919 | | 26.10 | | 3,414.15 |
| Oct. 3, 1919 | | | 187.00 | 3,601.15 |
| Oct. 7, 1919 | | | 220.00 | 3,821.15 |
| Oct. 17, 1919 | 100.00 | | | 3,721.15 |
| Nov. 10, 1919 | | | 148.00 | 3,869.15 |
| Nov. 22, 1919 | | | 375.00 | 4,244.15 |
| Dec. 3, 1919 | | | 200.00 | 4,444.15 |
| Dec. 13, 1919 | | | 250.00 | 4,694.15 |
| Dec. 18, 1919 | | | 200.00 | 4,894.15 |
| Jan. 1, 1920 | | 32.56 | | 4,926.71 |
| Apr. 1, 1920 | | 43.10 | | 4,969.81 |
| May 18, 1920 | | | 1,130.00 | 6,099.81 |
| June 1, 1920 | | | 214.00 | 6,313.81 |
| June 7, 1920 | | | 50.00 | 6,363.81 |
| June 14, 1920 | | | 300.00 | 6,663.81 |
| June 21, 1920 | | | 60.00 | 6,723.81 |
| July 1, 1920 | | 43.48 | | 6,767.29 |
| July 6, 1920 | | | 250.00 | 7,017.29 |
| Oct. 1, 1920 | | 61.40 | | 7,078.69 |
| Oct. 11, 1920 | | | 148.00 | 7,226.69 |
| Oct. 22, 1920 | | | 100.00 | 7,326.69 |
| Oct. 26, 1920 | 150.00 | | | 7,176.69 |
| Nov. 8, 1920 | 7,176.69 | (account garnisheed) | | 0,000.00 |

A glance at these accounts, from their inception, October 19, 1917, to their close, October 8, 1920, reveals their growth from day to day, with the size of the deposits increasing or decreasing, corresponding to the trade seasons in the mercantile business, making it highly probable, and I find it to be a fact, that every dollar that entered the two accounts came from the business of the bankrupt at 301 West Lake street, in the city of Minneapolis, Minn. If that finding be correct, then the testimony of the claimant is absolutely false and entirely unworthy of credit, and her claim filed in this case, resting upon her testimony, must fall with it.

There are other facts and circumstances disclosed by the evidence in the case that lend support to this view. The plan on which the bankrupt conducted his business with the aid of the claimant was one that would facilitate a fraudulent scheme of the character indicated. He kept no books of account, or, if he did, he concealed or destroyed them. If he had deposited his money in a bank, as business men do, a resort to his bank account would throw much light upon his transactions; but, so far as appears from the evidence in the case, he only had a bank account from the 18th of January, 1920, until the 30th of September of the same year. If he had preserved and had presented herein the check stub books and canceled checks for even that time, they would indicate what disposition he made of his receipts during that period; but no such check stubs or canceled checks were produced, nor was there any evidence offered to indicate that they exist.

An inventory taken within a month after that bank account was closed out showed stock of merchandise on hand $10,151.30. If the robbery of the store took place, as the bankrupt asserts, the value of the merchandise taken did not exceed, as he puts it, several thousand dollars; and if we assume the loss amounted to $2,000, it would appear that the stock of merchandise carried amounted to $12,151.30, which probably was the average stock carried by the bankrupt, considering his location, three miles from the business center of the city.

It is undisputed that $7,176.69 was paid to the four creditors mentioned from the alleged trust fund supposed to belong to the claimant's children, and that there was due to the remaining creditors $4,500. This would indicate that at the end of October, 1920, if there had been no robbery, there would have been merchandise on hand amounting to $12,151.30, and merchandise accounts payable, amounting to $7,-176.69, plus $4,500, or $11,676.69, plus $4,000 due to the claimant for wages as clerk in the store, a total of $15,676.69, or liabilities $3,525.39 in excess of the value of the stock of merchandise on hand. The reduction in the amount of merchandise indebtedness of $7,176.69 on the claimant's theory did not come from the receipts of the bankrupt's business, and when it was applied on the merchandise indebtedness there still remained $4,500 due to merchandise creditors.

With merchandise accounts payable practically equal to the value of the stock of merchandise on hand in the latter part of October, the question is: Why did that condition exist? Why were not the merchandise creditors taken care of from the receipts of the bankrupt's business, which suggests still another question: What became of the receipts

of that business during the 7½ months that the bankrupt's bank account was with the First National Bank of Minneapolis? It was not applied to the payment of the merchandise accounts payable. The receipts during the 7½ months from January 18 to September 30, 1920, or rather that portion of the receipts from the bankrupt's business during that period that was deposited in his account in the First National Bank from day to day, aggregated $18,717.97 or nearly $90 per day for each secular day.

It is fair to assume that the income during the period from January to September fairly represented the average income from the business, but the question that remains unanswered is: What became of it? It seems reasonable that, if the average stock was about $12,000 in value, the cash receipts from the business were such as to take care of the same, if the bankrupt's overhead in that store, or living expenses at home, or both, were not excessive. It would seem that the answer must be that the proceeds of the business from day to day from January 18 to the end of October, 1920, were not applied to the payment of the merchandise creditors, but were disposed of in some other manner.

The suggested discrepancy would probably be more glaringly apparent if it had been thought at all necessary in the investigation before the referee to have developed the amount of capital with which the bankrupt commenced business, the volume of his business, whether his sales were on a cash basis, the spread between the cost and selling price, and the items of the bankrupt's overhead expense. His rent, in the locality in which his business was carried on, occupying as he did a space of only 50 feet by 50 feet, could not have been excessive. There were no disbursements for help, as the claimant never received any compensation, and no other help was employed, except for a day or so at Christmas time, or similar occasions. The other items, gas, electric lights, taxes, fire insurance premiums, and similar items, were probably moderate, and there is nothing to indicate that the bankrupt suffered any losses from bad debts, or that he did not sell for cash, and at a satisfactory margin of profit. In his home the testimony is that the work was done entirely by the family, which consisted of the bankrupt, his wife, and three children, the eldest 16 years of age.

My conclusion is that the bankrupt and the claimant started in business on West Lake street with the fixed purpose and scheme in their minds of fleecing creditors to the greatest extent possible, and that they were quite successful; the first failure in the plan being the discovery and seizure by the four creditors of the fund accumulated from the bankrupt's business and deposited in the name of his child, as hereinbefore stated. The evidence discloses that for some time before the end came, the bankrupt was taking a law course to fit himself for the legal profession, apparently foreseeing and contemplating the termination of his mercantile career. It may be repeated that it is not very complimentary to the intelligence of courts to assume that a plan so bold in its conception and so coarse in its execution could meet with success.

With a claim of nearly $6,000, asserted by a wife against the bankrupt estate of her husband, under the circumstances disclosed by the record herein, assailed by creditors of the husband as fraudulent, the referee, in ruling upon the admissibility of evidence, should have permitted the most searching cross-examination of the claimant, instead of adopting the opposite policy, which made it almost impossible for the creditors to develop the facts and circumstances surrounding the claimant, the bankrupt, and his business to an extent that would enable the court to obtain a view of the situation rendering it possible to decide whether the foundation upon which the claim of $5,928.55 rests is one of fact or fable. The conclusion arrived at is: That the finding of the referee that the services performed by the claimant as a clerk in her husband's store between the 20th of December, 1916, and the date when the petition in bankruptcy was filed by her husband in 1922, were rendered under a contract between herself and her husband, by which she was to receive $75 per month for the first year, and $100 per month thereafter, is not only not sustained by, but is contrary to the evidence, and as a legal conclusion therefrom I find that the order of the referee, allowing the claim of the said Sophie Ralph, should be reversed, and said claim wholly disallowed.

[3] The record in this case indicates the existence of a practice which ought to be discontinued at once. On the hearing on the objection to the claim of Sophie Ralph, 144 pages of testimony were taken, and on the objections to the discharge of the bankrupt 270 pages of testimony were taken. Of the 144 pages, more than one-half consisted of the examination and cross-examination of witnesses on immaterial details, as well as on matters about which it was perfectly apparent that there was to be no contest, such as the question whether or not the claimant in fact performed the services she claimed to have performed in her husband's store, and if the referee had taken the case in hand, as he should have done, restricting the examining and cross-examining of witnesses to the issues and to contested matters, the first transcript mentioned ought not to have exceeded in volume one-half the number of pages transmitted to this court. The 270-page transcript ought not to have exceeded 75 pages, if that proceeding had been properly conducted.

[4] The proceedings before the referee were disgraced by exhibitions of rowdyism and blackguardism that must not be repeated in this or any other case hereafter tried before the referee. The attorney for the bankrupt and claimant seemed to defy the power and authority of the referee. He claimed the right to instruct his client, and did instruct her, just how to answer, warned her as to the trend of the cross-examination, cautioned her that traps were being set for her when particular questions were asked, and warned her not to step into them. He used most offensive and insulting language in making objections, language that was thoroughly calculated to provoke breaches of the peace, scoffed and laughed at the rulings made by the referee, and to perfectly proper questions on the part of the attorney for the trustee he constantly objected, on the ground that the same were silly, foolish, childish, and asinine. In a number of instances the record

shows that he directed the stenographer reporting the proceeding what record he should make.

At the first appearance of such misconduct on the part of the attorney, the referee should have given him fair warning to desist, and on his failure to do so should have separated him from the case, and ordered him from the room. If he failed to conform to such orders of the referee, the hearing ought to have been halted at once, and a certified transcript of the proceedings made and transmitted to this court, under section 41 of the Bankruptcy Act (Comp. St. § 9625). After one such certification, it is not at all probable that another would be necessary in the immediate future. The attorney referred to is Victor Petersen, of Minneapolis, Minn.

[5] The exceptions to the findings and order of the special master, of date August 6, 1923, are sustained, for the reasons stated in the foregoing memorandum.