* Headnote 1. Appeal Error, 4 C.J., Section 2873; 2. Railroads, 33 Cyc, p. 1012; 3. Railroads, 33 Cyc, p. 987; 4. Evidence, 23 C.J., Section 1791; 5. Railroads, 33 Cyc, pp. 1004, 1013.
This case was before us at the March Term, 1923. The following opinion rendered by TRIMBLE, P.J., at that term is hereby adopted as the opinion of the court on rehearing:
"Plaintiff, in a Ford automobile the top of which was down, was going south on Fourth street in the unincorporated village of Strasburg, Missouri, approaching defendant's railroad crossing. Upon reaching it, he was struck and severely injured by an eastbound fast-mail train going fifty-five or sixty miles an hour. He *Page 219 
instituted this action for damages based upon excessive speed and failure to give the statutory crossing signals.
The answer, in addition to a general denial, pleaded contributory negligence, charging that plaintiff, as he approached the crossing, neglected to look and listen for trains, and failed to keep his automobile under control so that he could stop in time when the train could be seen as he approached the crossing.
The trial resulted in a verdict and judgment for plaintiff in the sum of $5000, from which defendant perfected this appeal, contending, as the sole ground for reversal, that its demurrer to the evidence should have been sustained for the reason that the evidence conclusively shows plaintiff was negligent and that such negligence entered into and helped to bring about his injury.
It is conceded the train was going fifty-five or sixty miles per hour, and plaintiff introduced evidence tending to show that the crossing signals were not given. Consequently, before appellant's contention can be given effect, the evidence, considered in the light most favorable to plaintiff and giving him the benefit of every reasonable inference to be drawn therefrom, must conclusively disclose contributory negligence on plaintiff's part.
The following facts are beyond controversy: The above-mentioned fast-mail train goes east through Strasburg, without stopping, every morning about 10:30 at a speed of from fifty or sixty miles per hour. Plaintiff was a man nearly thirty-six years of age in the full possession of all his faculties. He was born and reared, and was still residing upon, his father's farm about a mile and three-quarters north of Strasburg. He was, and all of his life had been, familiar with this crossing; knew that many trains passed over it every day; and knew that this fast-mail train went through Strasburg every morning and that it did not stop. He knew also that it went through at great speed, that it was down grade there and the train did not make much noise as it came through Strasburg, and though he says he did not know the precise time it went, he did know that it went through *Page 220 
in the morning, and he had not heard it go through on the morning in question (May 3, 1921), and for this reason, as he proceeded along the road hereinafter mentioned, he says he had a train in mind and was looking, as he always looked, for a train. The train was about fifteen minutes late on the day in question.
There is likewise no dispute over the following facts: The main line track runs almost, but not quite, east and west through the town, running in a slightly northwest and southeast direction. For a distance of a mile west of Strasburg to and through the town the track has no curves, but is on a straight line. Fourth street, the one on which the collision occurred, lies north and south and is the second street east of the depot, Fifth street being between Fourth street and said depot. Plaintiff, in answer to a question whether it was 312 feet between the two streets and then eighty feet more from Fifth street west to the depot, said he had never measured it, but that, in his judgment, it was about 300 feet from the crossing west to the depot. Defendant's civil engineer, who made the plat showing location of depot and its distance west of Fourth street, testified that he measured the distance and the depot was 375 feet west of the crossing. The main track lies parallel with and is south of the depot. Plaintiff said he never measured the distance between the main track and the depot but he thought it was only eight or ten feet. Seaton, plaintiff's witness, said he never measured it, but he judged it was twelve feet from the north rail of the main track to the depot and ten feet from said north rail to the bay-window thereof. Defendant's civil engineer's measurement gave the distance from the main track to the depot as fifteen feet. The house track began at a switch on the main line at an unknown point west of the depot and, coming east, diverged far enough from the main line to pass along the north side of the depot and then go on east to and past the Fourth street crossing. At Fourth street the distance between the main track and the house track was thirty-three feet. *Page 221 
In the forenoon of May 3, 1921, plaintiff drove into Strasburg and, at a point about two blocks north of the railroad, turned south on Fourth street and went toward the crossing. To his right and along the west side of Fourth street a view of the railroad was prevented by various obstructions, such as sheds, houses, trees, etc., except at a point about 100 feet north of the railroad where a street running east and west crossed Fourth street thereby affording a view of the railroad to the west through a narrow open space. These obstructions along the west side of Fourth street continued on south to within a few feet of the house track. And on this house track west of Fourth street box cars were standing and extended west almost to Fifth street.
As plaintiff came south along Fourth street, he says he was driving at eight or ten miles per hour, slowing up however, as he got closer to the track. In going south the last 100 feet to the house track he knew his view was obstructed, and, as heretofore stated, he had a train in his mind and was looking and listening. After he crossed the house track and got into the thirty-three-foot space between the house track and the main track, there was nothing to obstruct his view to the west along the main track to the depot and nothing except the depot to obstruct his view further to the west. Plaintiff testified that after he crossed the house track and when he had gotten about ten or eleven feet south of the house track he stopped and looked for a train. He testified that at the point where he stopped he couldn't see past the depot; that he looked and couldn't see a train and listened and couldn't hear any, so, thinking it was safe to go over, he "put his foot on the clutch and started up and got started good and then: I just had thrown it in and I looked up and seen the train coming. "Q. Where was it, the train? A. It came from behind the depot like a streak of lightning."
He testified that he was eight or ten feet from the main track when he saw the train, and though he said on direct examination that "I looked up and seen the *Page 222 
train coming," yet on cross-examination when asked when hefirst looked west after starting up his car, he said, "I was looking all the time." He said that when he started up he put his car "into low," then took his foot off of "low" and threw his car into "high" and was going about six miles per hour and was about eight or ten feet from the main track when he saw the train "come along there (at the depot) a whizzing."
When he saw the train he said he put one foot on the clutch and pushed it in half way (throwing it into neutral) and his other foot on the brake and tried to stop but did not succeed in doing so, and the train hit his car as the front wheels went over the first rail. He testified that ordinarily, in going six miles an hour, he could stop in six or eight feet "if I was thinking about stopping and had my mind on nothing else." He said his car was under control and nothing the matter with it and he was not going so fast that he could not stop, yet seeing the train "it naturally excited me, I was scared," and he acted as quickly as he could but could not stop in time. He said the train was going sixty miles per hour. His cross-examination as to why he didn't stop was as follows:
"Q. You say you could not stop your car before you got on to the track? A. Well, I didn't.
"Q. You did not stop it? A. No, sir.
"Q. If you had had your car so you could have controlled it in that eight or ten feet you could have stopped your car and avoided this accident. A. If I had had what?
"Q. After you saw this train down there three hundred feet, couldn't you? A. It was under control, there was nothing the matter with the car.
"Q. What I mean is, if you had had your car so that you could have stopped it in that eight or ten feet, after you saw this train down there three hundred feet away, you would not have been hit? A. If I could have stopped I wouldn't? *Page 223 
"Q. I say, if you had had your car under such control that you could have stopped it in eight or ten feet, when you saw the train coming down there —. A. It would naturally excite anybody. I tried to stop.
"Q. But your car was not going at such a rate of speed that it could not stop? A. No sir, it was not.
"Q. Why didn't you stop it? A. I couldn't say. It didn't stop.
"Q. If you say you couldn't stop it in eight or ten feet — A. I say I didn't stop it.
"Q. What was there to hinder you from stopping it? A. I don't know. Under the circumstances the —
"Q. How fast was your car going? A. I don't know, I judge about six miles an hour."
If plaintiff stopped ten or eleven feet south of the house track and looked for a train, he was then twenty-one or twenty-two feet from the main track, since there was thirty-three feet of space between the house track and the main track. He said that from a point ten feet south of the house track he couldn't see past the depot at all, and that he couldn't see past it from where he stopped. And when pressed on cross-examination and asked if he would tell the jury the space along the depot, between the depot and the track, would not enable him to see some distance past the depot, he said, "It wouldn't up the track. It might have showed by a little angling across, you couldn't see up the track from there."
After testifying on cross-examination that from where he stopped he could see only to the depot and that it obstructed his view from seeing any further, he was asked:
"Q. Then without going any further, you started up your car to cross the track? A. Yes, I thought everything was clear.
"Q. You did not move your car on down a few feet so you could see down the track, before you went over? A. I didn't what?
"Q. You did not move your car down farther to a *Page 224 
point where you could see down the track? A. No, sir, I started up, aiming to get over the track.
"Q. And you started up knowing that you could not see the train further than the depot? A. Yes, sir.
"Q. And you say this train, this fast-mail that comes down there, down grade and makes scarcely any noise as it comes down? A. Yes, sir."
"Q. You knew that? A. Yes, sir."
On cross-examination he further testified as follows:
"Q. I will ask you if, when you got within fifteen or twenty feet of the track, you could not see down that track for a quarter of a mile past the depot and see a train coming down that track? A. Past the depot?
"Q. Yes. A. When you are fifteen or twenty feet from it?
"Q. Yes, of the main track? A. I do not believe so.
"Q. What would there be to hinder you from seeing down the track for a quarter of a mile when you were within fifteen or twenty feet of the track? That train coming along there about that time, I ask you what was there to prevent you from seeing down the track? A. If I am on the track?
"Q. I am asking you if you were within fifteen or twenty feet from the track what was there to hinder you from seeing that train for a quarter of a mile? A. I don't believe I can.
"Q. What? A. See around the depot that far?
"Q. You would not have to look around the depot? A. It don't set square.
"Q. You have just stated that the track was straight along past the depot?
"Q. You have stated that the depot stands back from the track some distance, at least ten feet? A. I didn't say that; I do not know how far it is back.
"Q. You just said ten feet? A. I said eight — I don't know —
"Q. When you got that close to the track was there anything to prevent you from seeing clear down the *Page 225 
track when you got as close to the track as the depot stood? A. When I got that close I seen the train.
"Q. What was your answer? A. I said when I got that close why I seen the train.
"Q. I am not asking you about that, I am asking you how far you could see down the track? A. I never tried to.
"Q. Would there be anything to hinder you from seeing down the track for a quarter of a mile or half a mile? A. Well, I never did try to."
Although plaintiff says in the foregoing that he couldn't see past the depot from a point fifteen or twenty feet out from the main track at the Fourth street crossing because the depot didn't "set square," yet both befor and after this he stated that the depot was parallel with the track and that the track for a mile west of Strasburg was straight and without curves. The depot didn't "set square" with the world, it is true, but as the track was straight from the Fourth street crossing for a mile of town and the depot was parallel with the track, this fact would not change or affect the distance one could see past the depot from a point fifteen or twenty feet north of the main track and 300 or 375 feet east of the depot.
Plaintiff, on being cross-examined as to how far down the track he could see from a point eight or ten feet north of the main track, testified as follows:
"Q. Now, Mr. Aldridge, do you tell this jury that when you looked up you were about eight or ten feet from the track, that is when you saw the train coming? A. Yes, something like that.
"Q. And you say that the train was right there at the depot then? A. I seen it come along there a whizzing.
"Q. When you were up eight or ten feet of the track you could see clear down the track, couldn't you? A. I seen the train about that time. *Page 226 
"Q. I say if it had been a mile down there you could have seen it? A. Yes, after I got close up to the track.
"Q. It was then three hundred feet? A. The train?
"Q. Yes. A. It was somewhere near that. I never measured it to be honest about it."
He was then re-cross-examined and testified as follows:
"Q. I will ask you to state again to the jury if instead of stopping back there fifteen or twenty feet when you say you could not see past the depot and see this train coming, you drove up within about ten feet of the track and stopped your car and when you could look down the track whether or not you could have avoided this accident? A. I don't know.
"Q. Tell the jury why you could not have avoided it if you had done that? A. I naturally thought I could hear it.
"Q. Answer my question. If instead of stopping back there fifteen or twenty feet —"
Objection made and overruled.
"Q. I will ask you to listen to the question so you will understand it. Instead of stopping back there fifteen or twenty feet when you say you could not see the train coming down the road past the depot because the depot obstructed your view, then if you had gone eight or ten feet from the track and where you could have seen it if you had done that, state whether or not you could have avoided this accident?"
Objection made and overruled.
"A. It depended upon whether I had seen the train or not. If I had seen it I never would have started up again.
"Q. If you had been eight or ten feet you could have seen the train clear down past the depot? A. I don't know.
"Q. Have you not already told the jury that when you got up to the track the same distance that the depot *Page 227 
is from the track you could see clear down the track? A. I told them I could if I was on the track.
"Q. I am asking you if you got as close to the track as the depot was to the track, eight or ten feet, if you couldn't see clear down the track? A. I don't believe you could.
"Q. What would there be to hinder you from that — when you got as close to the track as the depot what would hinder you from looking down there? A. The depot sets like the track, you know.
"Q. That would make your vision straight down the track, wouldn't it? A. No, I do not believe it would.
"MR. HAYNES: The witness has never testified in this case that that depot was ten feet from the track.
"MR. BOWKER: He said eight or ten feet.
"A. I said I never measured it, I said I guessed it was something like that.
"Q. I am assuming you are correct. I will ask you to state again to the jury when you got within eight or ten feet of the track, the same distance you say the depot set from the track, what kept you from seeing down the track for a quarter or half a mile?
MR. HAYNES: The same objection.
"THE COURT: Overruled.
"A. You say —
"MR. WHITSITT: If you do not understand the question, have him repeat it.
"Q. What was there — A. What would keep me from seeing if I was seven or eight feet from the track?
"Q. Yes, the same distance you say the depot is from the track, what kept you from — A. You might do it if you were close enough to the track.
"Q. I am asking you if you got up where the depot was, the same distance — A. If you were close enough to the track you could do it.
"Q. If you had driven up to that point and looked down there you would have seen the train coming? A. If it was clear beyond? *Page 228 
"Q. Yes. A. Yes.
"Q. The reason you didn't see this train coming down there was because the depot was in the way and you stopped back here too far to see past the depot? A. I don't know whether I did or not.
"Q. Didn't you tell the jury you didn't see it because the depot — A. No, sir, I never seen it or heard it.
"Q. The reason you didn't see it was because you stopped back here at a point back of the depot? A. Yes, sir."
Plaintiff's witness, Seaton, who said it was ten feet between the main track and the bay-window of the depot, but who did not measure it, testified on cross-examination, that from the south rail of the house track one could see the main track for a distance of twenty-five feet past the depot, and at a point midway between the house track and main track one could see down the main track a quarter of a mile past the depot, and at a point eight feet from the track one could see three-quarters of a mile past the depot. Seaton's testimony that at a point midway between the two tracks one could see a quarter of a mile west of the depot practically agrees with the evidence of defendant's civil engineer Hall who testified that he made observations and at a point twenty-three feet south of the house track one could see the main track for a distance of a quarter of a mile west of the depot.
Plaintiff testified that from the time he saw the train until the collision, "it was a second; an instant." So that, when at a point eight or ten feet from the track he first saw the train, it was impossible for it to be as far away as the depot and yet be able to traverse that distance, even putting it at plaintiff's estimate of 300 feet, in time to catch him as it did. For, at sixty miles per hour, it would take the train three and four-tenths seconds to travel that distance if it was 300 feet according to plaintiff's guess, and over four and one-fourth *Page 229 
seconds if it was 375 feet as Hall's measurements found it to be. Or, to state it differently, plaintiff, going six miles per hour, had ten feet to go while the train going sixty miles per hour had 300 or 375 feet to go. While the train was going ten times as fast as the automobile, yet the train had thirty or thirty-seven and one-half times as far to go. Consequently, for it to be at the depot when plaintiff at ten feet from the track first saw it, the train would have had to travel three times as fast as it did and make 180 miles per hour, according to the distance given by plaintiff, or three and three-fourths times as fast as it did and make 225 miles per hour if the distance was 375 feet. Neither of these speeds is possible under present conditions, and no one claims the train was going anything like that fast. Clearly, therefore, the train must have been east of the depot at the time plaintiff reached a point ten feet from the track, and must have been at, or nearly to, the depot when plaintiff crossed the house track. When he stopped at a point ten or eleven feet south of the house track and looked, from whence he says he could not see past the depot, plaintiff still had twenty-two or twenty-three feet to travel before reaching the main track; and although he says in one place that he was "looking all the time," yet clearly, if he were, he could have seen the train before he got as close as ten feet to the track; and in going at the slow speed he was going he could easily have stopped in safety in the distance he still had. [Tannehill v. Kansas City, etc., R. Co., 279 Mo. 158, 169.] This is true even upon his own theory that he stopped at a point where he could not see past the depot; and takes no account of the fact that he should not have stopped at a point where he could not see, but should have gone a few feet further and stopped where he could see. It was his duty under the law to do this. [Tannehill v. Railroad, supra, l.c. 170; Evans v. Illinois Central R. Co., 233 S.W. 397, 399.] And especially was this true since he was acquainted with the crossing and knew how trains might be *Page 230 
expected to pass over it. Even under the situation as plaintiff's own evidence depicts, it is difficult to see what there was in the situation to frighten or disconcert plaintiff when he saw the train, if he was looking carefully as he says he was and had his car under that control which the approach to the crossing required. It does not appear, however, that his fright prevented him from doing all that he could have done after he discovered the train. He says he threw off the power, put on the brakes and did everything he could to stop. We do not mean to infringe upon or narrow the doctrine that where one is suddenly placed in a perilous position by the negligence of another, he cannot be held conclusively guilty of contributory negligence because he did not do exactly the best thing for himself. Plaintiff invokes that doctrine here, but in our view it is not applicable. This is so, because the contributory negligence charged does not inhere in anything he did or failed to do after he saw the train, but the charge is that plaintiff was negligent in getting into the perilous situation and before he discovered the train. This appears still more clearly when we consider that plaintiff says he stopped at a point ten or eleven feet south of the house track (which left him twenty-three or twenty-two feet yet before reaching the main track), and then started up and was going good and was eight or ten feet from the track when he saw the train. Consequently he traveled thirteen or fourteen feet toward the track before he saw the train, when, as hereinabove shown, the physical facts show the train was where it could have been seen at least while he traveled a part of that distance, even upon his theory that at the point where he stopped he could not see past the depot at all. But, with the conceded facts that the track was straight and the depot sat parallel therewith and if only ten feet out therefrom as Seaton's estimate put it (for plaintiff said he himself did not know), it is manifest one could have seen a train even before it reached the depot from a point much farther north of *Page 231 
the track than ten feet. And, therefore, had plaintiff been looking, or, if looking, had he looked with any care, he would easily have seen the train before he reached the point where he says he first saw it. . . . Evidence that is opposed to conceded physical facts is without probative force and must be disregarded. [Payne v. Chicago, etc., R. Co., 136 Mo. 562, 584; Hook v. Missouri, etc., R. Co., 162 Mo. 569.]
Much evidence is in the record concerning the obstructions preventing a view of the railroad to one coming south on Fourth street and before reaching the house track. This, however, does not control the case. The question is what view could be had of the approaching train after the house track is crossed and while the thirty-three feet of space between it and the main track is being traversed. We have carefully studied this record both on this and the former hearing; and the only conclusion we have been able to reach is that plaintiff's evidence and the conceded facts conclusively show that plaintiff either did not look, or, looking, negligently failed to see the train at a time and place when he could have seen it and easily stopped in safety, allowing it to go by. Recovery was denied in a case where there was less space and opportunity to see the train and avoid the collision than plaintiff had. [State ex rel. v. Bland, 237 S.W. 1018.] When the situation thus described above is disclosed, the plaintiff, being guilty of contributory negligence, cannot recover. [Evans v. Illinois Central Railroad Co., 233 S.W. 397; Kelsay v. Missouri Pacific R. Co., 129 Mo. 362; Hayden v. Missouri, etc., R. Co., 124 Mo. 566; Tannehill v. Kansas City, etc., R. Co.,279 Mo. 158.]
Because the engineer and fireman did not see plaintiff does not show that plaintiff was unable to see the train sooner than he did. The fireman was on the side of the engine next to the plaintiff, but he was observing a man at the depot, watching to see that he did not get in the way of the train and when he saw that he would not, he gave attention to the water gauge. The engineer *Page 232 
was on the opposite side of the engine from plaintiff and did not observe the latter's approach from the north. The failure of each to see the other did not arise from the same cause. . . ."
After careful review of the entire record, together with briefs, citations and arguments on rehearing, we can arrive at no other conclusion than that under the facts and law applicable thereto, the trial court erred in refusing to sustain defendant's demurrer. The judgment is therefore reversed.
All concur.