MARTHA NAOMI LOHMANN, (Plaintiff) Appellant, v. WABASH RAILROAD COMPANY, a Corporation; and J. E. LATTA and CLAUDIA LATTA, Partners d/b/a J. E. LATTA CONSTRUCTION COMPANY, (Defendants) Respondents, No. 43878—269 S. W. (2d) 885.

Division One, July 12, 1954.

Walter Wehrle and Forrest Boecker for appellant.

Albert E. Schoenbeck for respondent Wabash Railroad Company.

912

*Sievers, Reagan & Schwartz* for respondent J. E. Latta Construction Company.

CONKLING, J.—Martha Naomi Lohmann, plaintiff-appellant, in her action for damages for the alleged wrongful death of her husband, had a verdict of the jury and the ensuing judgment thereon for $15,000 against defendants Wabash Railroad Company and J. E. and Claudia Latta, doing business as J. E. Latta Construction Company. Upon defendants' timely motions therefor the trial court thereafter set aside the judgment entered upon the jury's verdict, and entered judgment in favor of defendants in accordance with defendants' separate motions for a directed verdict filed at the close of all the evidence in the case. The plaintiff thereupon appealed to this Court.

Plaintiff's husband, Jacob D. Lohmann, was killed when the southbound truck he was driving was struck by an eastbound Wabash mail train at about 8:30 a. m., on December 26, 1951, at the Eva Avenue public grade crossing in St. Louis County, Missouri. The train was pulled by a Diesel locomotive. The length of the entire train was

"upwards of seven hundred and fifty feet." It was running at about sixty miles an hour. From the Eva Avenue crossing the railroad track was straight to the west for at least two miles. The day was fair and clear. The case was submitted upon primary negligence.

As against defendant Wabash, plaintiff's instruction No. 1 submitted her case to the jury upon the theory that a "grease shack" was located upon defendant's right-of-way west of the crossing and north of the railroad track; that the grease shack obstructed the vision of plaintiff's decedent to the west along the track while he was on Eva Avenue, and continued to obstruct his view of the approaching eastbound train as he approached the railroad track until the front of his truck was on the north rail of the railroad track; that "such obstruction to vision" rendered the crossing unusually hazardous to plaintiff's husband; that under the above circumstances "the sounding of a bell and whistle (on the Diesel locomotive) was not adequate to warn" deceased of the train's approach from the west; that Wabash could have known of such "unusually hazardous condition" in time thereafter to have "provided adequate means of warning" to persons using the crossing, to enable such persons to remain clear of the tracks when trains approached, but that Wabash negligently failed to do so.

As against defendants J. E. and Claudia Latta, plaintiff's instruction No. 2 submitted her case to the jury upon the theory that such defendants caused the "grease shack" to be placed on the Wabash right-of-way at the place above alleged; that that shack obstructed Lohmann's vision as above noted; that Latta knew the shack would so obstruct vision as above; that the vision of plaintiff's decedent was obstructed as above "so that he could not stop in a place of safety for the purpose of looking out for approaching trains"; that Latta was negligent in permitting the shack to be so placed and to so remain; and that such negligence of these defendants proximately caused the death of plaintiff's deceased husband.

On the morning of his fatal injury plaintiff's husband was a truck driver in the employment of Grantwood Construction Company. That company was engaged in trucking in and out of the "Atomic Energy Grounds," a restricted and fenced area lying north of and about 500 feet west of the Eva Avenue railroad crossing. When Lohmann's truck was checked out of the east gate of the "Atomic Energy Grounds," for the trip in question, he then drove it east on the Brown road to Eva Avenue. Brown road lay about 60 feet north of and paralleled the Wabash track. Lohmann then turned the truck off of Brown road to his right and south into Eva Avenue, turning just to the north and east of a certain telegraph pole which pole, by steel tape measurement, was located 52 feet north of the railroad track and just west of Eva Avenue. Entering onto Eva Avenue, Lohmann drove the truck south toward and onto the railroad track

914

where his truck was struck by the eastbound Wabash train. At the west edge of Eva Avenue and 10 feet north of the north rail there was a standard railroad crossing sign with wooden crossed arms, upon which was painted in large letters the words, "RAILROAD CROSSING." For several weeks prior to December 26, 1951, Lohmann had driven the truck over the same route and over the same railroad crossing from fifteen to twenty times each day. The approach to the track on Eva Avenue from the north was slightly upgrade.

Defendants J. E. and Claudia Latta had been engaged in some road work under construction near the "Atomic Energy Grounds." These defendants owned and had placed the above mentioned "grease shack" on the Wabash right-of-way north of the track during the first week in October, 1951. It was there at the time of this occurrence. The grease shack contained grease and oil, was kept locked, and its contents were used by Latta as needed to lubricate caterpillar and road grading machinery used nearby. The shack was eight feet wide from north to south, ten feet long from east to west, about twelve feet high, and was on wheels so it could be moved from one construction job to another. It was a part of Latta's general equipment in doing road jobs with large machinery. At the time of the occurrence in question the south side of the grease shack was twenty-three feet and seven inches north of the north rail of the railroad track and the east end of the grease shack was 147 feet west of Eva Avenue.

It appears from the testimony of one of plaintiff's witnesses, Mr. Barbour, a Civil Engineer who made measurements with a steel tape, and who made observations as to visibility and measured such distances, that when a southbound truck driver approached the track on the Eva Avenue crossing, the vision to the west along the railroad track is clear, i.e., the southbound truck driver could see an eastbound train, west of the crossing and south of the grease shack, as follows: when the front of the truck was 50 feet north of the north rail, the train could have been seen 290 feet west of the crossing; when the truck was 40 feet north of the north rail, the train could have been seen 375 feet west of the crossing; when the truck was 35 feet north of the north rail, the train could have been seen 475 feet west of the crossing; when the truck was 30 feet north of the north rail, the train could have been seen 750 feet west of the crossing; when the truck was 25 feet north of the north rail, the train could have been seen 3800 feet west of the crossing; when the truck was 15 feet north of the north rail, the train could have been seen two miles west of the crossing; when the truck was 10 feet north of the north rail, the train could be seen two miles west of the crossing; when the truck was 5 feet north of the north rail, the train could be seen two miles west of the crossing; and that when the truck reached the north rail, the train could be seen two miles west of the crossing.

Photographic exhibits introduced in evidence and filed here confirm beyond all doubt the just above testimony of the engineer witness. The following attached photographic exhibit 2, taken with the camera on Eva Avenue pointed west along the railroad track, and with the camera located 23 feet north of the north rail, and with the grease shack in the exact location it stood at the time of the occurrence, may aid in an understanding of the situation for the exhibit demonstrates the visibility south of the grease shack and west along the track over which the train approached the crossing.

One of plaintiff's witnesses, Arthur Smith, had checked Lohmann out of the east gate of the Atomic Energy Grounds just shortly before this collision. Smith was at his post of duty 500 or more feet west and north of the Eva Avenue crossing and saw the eastbound train approaching the crossing. Smith testified, "I thought about the truck, and looked on down the line. I thought it hadn't been very long since I checked him (Lohmann) out, and I thought 'I wonder where he (Lohmann) is?' And I looked on down there and his front wheels were on the track." The collision then occurred. Smith did not go down to the scene of the collision. Smith also testified that he had used the crossing in question to drive to and from his work at the Atomic grounds, and that the "grease shack" obscured the view of a person driving south toward and approaching the Eva Avenue railroad crossing until "you were on the track." Smith also further testified: "Q. Did you ever go down there since this accident and measure back twenty or twenty-five feet north of the crossing and then look down and see how far you can see? A. No I never went down only in my automobile, coming in or going home. I never got out of my car. Q. So you made no measurements to see how far down the track you could see when you got within twenty or twenty-five feet of it? A. That's true." * * * "Q. As I understand, you never, at any time, ever went down after this accident happened, you never went down to the crossing involved, and looked to the west, to see how far you could see something at the crossing? A. No, but I drove over it. Q. You never, at any time, measured off ten feet from the crossing to see how far you could see? A. No. Q. And you never measured off fifteen feet to see how far you could see to the west? A. No. Q. Or you never made any observation twenty-five feet from the crossing? A. *The only time I made observation was when I got up to the track.*" [Emphasis ours.]

Another of plaintiff's witnesses, Mr. Barkey, employed at the Atomic Energy Grounds, also testified that he daily drove over the crossing to and from his work; that the grease shack obstructed the view to the west along the railroad track of a person approaching the track from the north, until such person was "practically on the tracks. You had to be on the track before you could see down to the west." But Mr. Barkey also further testified: "Q. You never

made any measurements as you drove over the crossing in a car as to how far west you could see from the crossing? A. How far west? Q. Yes. A. *No. I never made any measurements at all, of any distances. All these figures I'm giving you are estimates."* * * * "Q. You never measured that. That's merely an estimate on your part? A. *I said everything I've given is an estimate. I never measured anything; had no occasion to."* [Emphasis ours.]

Another of plaintiff's witnesses, Nevin Fisher, who sometimes used the crossing, and who went to the scene of the accident some time after the collision, was asked "Q. Do you reach a point finally (in approaching the crossing from the north) where you do then have a fairly clear view of the tracks? A. When you do you're entirely at, or on, the tracks. * * * Q. Did you ever go down to the crossing there and look west of (along) the railroad tracks to see how far you could see? A. Nothing more than when I was crossing the tracks. Q. You never made any tests? A. No. * * * [890] Q. As soon as you pass the telegraph pole, from that distance, whatever that distance is, can you see down the tracks for some ways down there? A. I would say you can see down (west) perhaps five hundred feet. You can see as far as our east gate. Q. So a person if they make this turn, around this telegraph pole, to go south across the track, could see about 500 feet down the track? A. Yes. Q. When they get down closer to the way (track), they would have a further view? A. It would increase. Q. And when they got within 10 feet of the track they could see as far as the eye could see, couldn't they? A. If you had an unobstructed view. * * * Q. You don't contend when I got within 10 feet of the track that grease shack would obstruct my view looking (west) down the right-of-way? A. I wouldn't say definitely it would."

The engineer and fireman testified that when the train was approaching this crossing, the automatic bell ringer was on and the bell had been ringing for two miles west of and up to the crossing; and that the emergency brakes were applied 200 to 250 feet west of the crossing, but the train ran about 750 feet after striking the right front wheel of the Lohmann truck. When the train was 200 to 250 feet west of the crossing the engineer and fireman saw the Lohmann truck 10 to 15 feet north of the track and moving toward it. They (and others of the train crew) testified the bell was then ringing and the regular crossing whistle was then sounding. Other witnesses called by plaintiff, who were at the Atomic Energy Grounds, testified they heard no bell or whistle. The engineer and fireman and Arthur Smith were the only eyewitnesses.

There was no direct evidence as to the speed of the truck. However, from the above undisputed evidence as to the speed of the train, it is inferable that the speed of the truck was only 3 or 4 miles per hour during its last upgrade fifteen feet of travel before the collision. In

any event, possibly only two and certainly less than three seconds elapsed from the time the truck was 15 feet from the north rail, until the collision occurred.

Plaintiff-appellant contends that the trial court erred in entering the above noted judgment for the defendants, and asserts that plaintiff made a submissible jury case against each of the defendants. Plaintiff's brief states her position in these words: "* * * the crossing * * * was unusually hazardous because a contractor's field shack on defendant railroad's right-of-way obscured decedent's vision until his truck reached a point afoul of the main line (railroad track). The jury was asked to find whether these circumstances, if true, rendered the usual bell and warning whistles inadequate and whether the railroad knew of the condition and could have furnished adequate warning of the approach of its trains. * * * On this issue we are entitled to that view of the evidence which is most favorable to plaintiff."

Defendants each contend that Lohmann was guilty of negligence as a matter of law in driving the truck onto the track in front of the train under circumstances where he could have seen the train approaching if he had looked. Defendants assert that the above set out testimony of Smith, Barkey and Fisher that the grease shack obscured Lohmann's view of the approaching train until the front of his truck was on the north rail, must be disregarded because at variance with the physical facts that his view to the west was not obscured and that the train was in his plain sight as Lohmann approached the railroad track. The defendants Latta assert also that the presence of the shack on the right-of-way was not the proximate cause of the collision of the train and the truck.

A number of photographic exhibits introduced in evidence taken with the camera at different places north of the track on Eva Avenue and pointed to the west, showing the view of the track west of the crossing and the location of the grease shack at the time have been filed here and are all before us. The above and attached photographic exhibit 2, (looking west from Eva Avenue) shows the fence around the Atomic Energy Grounds at the far right, and a portion of the Brown road as that road came east toward Eva Avenue; a portion of the west edge of Eva Avenue appears at the bottom of the picture; the above referred to crossing sign is at the left; the grease shack appears on the railroad right-of-way at the place it was when the collision occurred; the crossing itself is at the left and is not shown in the photograph; the above referred to telegraph pole is at the right and is not shown in the photograph; but the exhibit indisputably and unqualifiedly shows the view of the track west of the crossing which Lohmann had when he was 23 feet north of the north rail. Other photographic exhibits now before us, taken with the camera at other places on Eva Avenue show the same objects and

substantially similar views but the other photographic exhibits need not be specifically detailed or set out in this opinion. The testimony of plaintiff's above referred to Civil Engineer witness, Mr. Barbour, who made measurements with a steel tape, and who observed, measured, made tests as to vision, and testified as to the distances a truck driver could see an approaching eastbound train west of the crossing when the truck was 50 feet north of the crossing, and 40 feet north, and 35 feet north, and 30 feet north, and 25 feet north and 15 feet north, and 10 feet north has unequivocal support in the photographic exhibits introduced and now before us.

What may be seen from a certain place under admitted or undisputed conditions and circumstances, and the view or line of sight under such circumstances is a physical fact, clearly and unequivocally demonstrable by photographic evidence. And where physical facts speak with a force which overcomes testimony to the contrary, reasonable minds must accept and follow the physical facts and therefore cannot differ. It has long been the rule in this jurisdiction that where testimony is, beyond any reasonable doubt, contrary to established physical facts or laws and facts of common knowledge, it cannot be accepted as substantial evidence. And if the testimony of a witness upon a material issue is inherently impossible, or is so opposed to all reasonable probability as to be manifestly false, the courts are not bound to accept it and will wholly disregard it. State ex rel. Kansas City Southern v. Shain, 340 Mo. 1195, 105 S. W. (2) 915, 919, and cases cited, Donald v. M. K. & T. R. Co., Mo. Sup., 231 S. W. (2) 627, and cases cited, Aldridge v. Mo. Pac. R. Co., 215 Mo. App. 217, 256 S. W. 93, Carner v. St. Louis-S. F. R. Co., 338 Mo. 257, 89 S. W. (2) 947, 950, Benton v St. Louis-S. F. R. Co., Mo. Sup., 182 S. W. (2) 61.

This case, therefore, boils down to the question of whether there is substantial evidence before us that Lohmann could not have seen the approaching train which struck his truck in time for him to have refrained from driving upon the track to his certain doom. If the testimony of Smith, Barkey and Fisher, above set out, is so contrary to the demonstrated physical facts that its rejection is compelled, then there is no substantial evidence before us that Lohmann could not have seen the approaching train in time to stop short of the track. "In rejecting evidence as contrary to physical facts or laws, 'the court does not weigh the evidence in the judicial sense of that term.'" Hardin v. Ill. Cent. R. Co., 334 Mo. 1169, 70 S. W. (2) 1075, 1079, Clark v. Bridge Co., 333 Mo. 721, 62 S. W. (2) 1079, 1082. Giving consideration to all the physical facts as established by actual measurements, tests and photographs we are compelled to rule that the testimony of Smith, Barkey and Fisher is plainly contrary to the demonstrated physical facts. And, too, the above quoted testimony of those three witnesses clearly demonstrates that their statements

920

that Lohmann could not have seen the approaching train until he was on the north rail are wholly without probative value. Those witnesses destroyed their own testimony. Their testimony, considered separately or as an entirety, does not rise to the dignity of substantial evidence that Lohmann could ▇ not have seen the approaching train until he was on the north rail. And under these instant circumstances we will not stultify ourselves by giving credence to such testimony, but will wholly disregard it. The above referred to physical facts, as indubitably established by actual measurements, tests and photographs demonstrate beyond all possibility of doubt that if Lohmann had looked at all he could have seen the approaching train in time, at the speed his truck was moving, for him to have stopped in a place of safety north of the track.

▇ It has long been the rule in this State that a railroad track of itself is a sign and warning of danger requiring one who is approaching and about to cross the track to look and listen for approaching trains before driving thereon. A motor vehicle driver, particularly one familiar with a railroad crossing and about to drive thereover, is required to exercise the highest degree of care to keep a lookout and to observe and watch for the possible approach of trains. If a motor vehicle driver, having a clear view down the railroad track, in daylight drives upon the track when by looking could have seen an approaching train, if he obviously failed to look for a train before so driving thereon, is guilty of negligence as a matter of law. Kirkpatrick v. Wabash R. Co., 357 Mo. 1246, 212 S. W. (2) 764, State ex rel. Kansas City Southern v. Shain, supra, Kelsay v. Mo. Pac. Ry. Co., 129 Mo. 362, l. c. 374, 30 S. W. 339, l. c. 342, 343, Monroe v. Chicago & A. R. Co., 297 Mo. 633, 249 S. W. 644, Hook v. Mo. Pac. R. Co., 162 Mo. 569, 63 S. W. 360. This Court has long declared that the failure of one approaching a railroad crossing with which he is familiar to see what was plainly visible before his eyes is conclusive evidence of negligence. Time without number this Court has reaffirmed what we held in an early case, that: " 'If a traveler, by looking, could have seen an approaching train in time to escape, it will be presumed, in case he is injured by collision, either that he did not look, or, if he did look, that he did not heed what he saw. Such conduct is held negligence per se.' " Kelsay v. Mo. Pac. Ry. Co., supra.

The record now before us demonstrates beyond any possible doubt that it was a physical impossibility for plaintiff's husband, while yet in a place of safety and where he could have stopped, to have failed to see the approaching train, if he had looked to the west as he was approaching the railroad track, as it was his duty to have done. If he had so looked, there is no question but that he could and would have seen the approaching train and stopped his truck, and waited for the train to pass over the crossing. But it is obvious that he did

not look. The deceased lost his life through his own negligence in failing to discharge the duty imposed upon him by law. And it does not appear that the placing of the grease shack upon the right-of-way was a proximate cause of Lohmann's death. The grease shack did not obstruct Lohmann's vision of the approaching train. Unfortunately, the failure of plaintiff's husband to exercise the duty imposed upon him by law for his own self-preservation was clearly the proximate cause of his untimely death.

Plaintiff's contention made and urged in her brief that the testimony of record made a case for the jury is based entirely upon her argument that Lohmann's vision was obstructed "until his truck reached a point afoul of the main line." We have held above that there is no conflicting evidence in the case upon that issue. Therefore, no such issue of fact was made for submission to the jury. And careful reading of the transcript shows that all the facts of the case were fully developed.

Having concluded that plaintiff's decedent was negligent as a matter of law, and because such negligence bars plaintiff's recovery, it is not necessary to discuss or rule the other points raised in plaintiff's brief. The judgment of the circuit court is affirmed. It is so ordered. All concur.