Elsie A. DAVENPORT, Respondent,

v.

WABASH RAILROAD COMPANY, a Corporation, Eunice Harold Potter and Charles T. Bagby, Appellants.

No. 53849.

Supreme Court of Missouri, En Banc.

Dec. 31, 1968.

Spencer, Hines & Petri, Columbia, for respondent.

Terence C. Porter, Columbia, for appellants; Welliver, Porter & Cleveland, Columbia, of counsel.

HENLEY, Judge.

Action by a widow for damages for the wrongful death of her husband arising out of a grade crossing collision involving the decedent's eastbound automobile and a southbound Wabash Railroad Company (hereinafter Wabash) mixed passenger and freight train in Boone County, Missouri. Verdict and judgment were for plaintiff and against the defendants for $11,542. Defendants' after-trial motion was confined to a motion to set aside the verdict and judgment, and for judgment in accordance with their motion for directed verdict. The motion was overruled and defendants appealed to the Kansas City Court of Appeals. That court reversed the judgment, holding that plaintiff's decedent was guilty of contributory negligence as a matter of law. We ordered the case transferred to this court on application of plaintiff-respondent. Our determination of the case 'is the same as though it were here on original appeal. Article V, § 10, Constitution of Missouri, V.A. M.S.; Civil Rule 84.05(h), V.A.M.R. We reach the same result as did the Court of Appeals, for the same reason.

The case was submitted to the jury on two specifications of primary negligence, and contributory negligence. Plaintiff's submission was: (1) that the crossing was an unusually dangerous and hazardous one which the Wabash had negligently failed to make reasonably safe for motorists traveling east; and, (2) that defendants had negligently failed to ring a bell or sound a horn or whistle as required by § 389.990, RSMo 1959, V.A.M.S. Defendants' submission was that plaintiff's decedent had negligently failed to keep a careful lookout.

The issues on appeal relate to (1) whether plaintiff made a submissible case; and (2) whether plaintiff's decedent was guilty of contributory negligence as a matter of law.

The first point briefed by defendants is that the court erred in overruling their motion for directed verdict at the close of the whole case and in overruling their after-trial motion for judgment in accordance with the motion for directed verdict, because plaintiff's decedent was guilty of contributory negligence as a matter of law.

The burden is on defendants to prove that plaintiff's deceased husband was guilty of negligence contributing to his death. The jury could believe or disbelieve defendants' evidence on that issue, even though uncontradicted; therefore, we ignore their evidence to the effect that the crossing was not dangerous or hazardous, that the train's whistle or horn and bell were sounded at a point one-quarter mile north of the crossing and continued to sound from that point through the crossing, and other evidence produced by defendants tending to prove plaintiff's decedent was contributorily negligent. It follows that proof of deceased's negligence must appear from evidence adduced by plaintiff or from evidence which she concedes to be true, or by proof of facts and circumstances by defendants which leave no room for other reasonable inference, or from a combination of them, in order that a court correctly may declare plaintiff's decedent contributorily negligent as a matter of law. Pipes v. Missouri Pacific Railroad Company, Mo., 338 S.W.2d 30, 33[2-4], and cases there cited. We examine the evidence in the light of the above rule.

The following facts are not disputed. The accident occurred at about 12:50 P.M., October 19, 1963, a clear, dry, warm Saturday afternoon, near Brown Station approximately ten miles north of Columbia at a point where a public gravel road crosses the Wabash tracks some fifty-eight feet east of State Route B. The train was due to arrive in Columbia near the noon hour; hence, at the time of the collision it was at least 50 minutes late. In this area the railroad tracks run generally north-south; Route B runs parallel to the tracks and, as indicated, is west of the tracks; the level of the tracks at the crossing is ten or twelve feet higher than the surface of Route B, thus an automobile approaching the crossing from Route B drives up a 15 to 20% grade. The gravel road serves several families living east of the railroad; it begins at Route B, runs east up to and crosses the tracks and then turns to run south for an undisclosed distance before it again turns back east toward the home and farm of plaintiff's family, approximately two miles east of Brown Station. Immediately north of the crossing the tracks run through a shallow "cut"; south of the crossing the tracks are on a "fill." North of the gravel road, between Route B and the tracks, the surface of the ground is uneven and is above the surface of the road; from the top of the "cut" near the tracks the terrain slopes, unevenly, downward and west toward Route B; on the date of the accident this area was covered with weeds and grass part of which varied in height from three to five feet. The crossing itself is constructed of heavy flat planks or timbers approximately fifteen feet long laid lengthwise with and secured between the rails and one such plank on the outside of each rail. Pictures introduced in evidence show that the two planks next to and on each side of the west rail have deteriorated and begun to break up and break

off at one end, apparently due to wear and the elements. The crossing was marked only with the standard railroad crossing sign, commonly known as a "cross-buck"; there were no other devices to give warning of the tracks or the approach of a train. North of the crossing approximately 350 feet the tracks begin to curve gradually to the northeast. The deceased, Bruce E. Davenport, age 47, was familiar with this crossing, having crossed it almost daily for eighteen years. At the time of the accident Mr. Davenport was en route from Columbia to his home; he was alone in his automobile; he traveled north on Route B, turned to his right (east) onto the gravel road and drove upgrade toward the crossing and into collision with the southbound train. The point of impact on the vehicles was the right front corner of the Wabash engine and the left front corner of the automobile. Three eye-witnesses survived the collision: Charles T. Bagby, the engine fireman sitting at its west window, and Mr. and Mrs. William Timbrook, who were driving south on Route B in a pickup truck, all of whom testified on behalf of defendants.

Plaintiff and defendants introduced into evidence several pictures showing the crossing, the gravel road, and the area and character of the terrain north of the road between Route B and the track. They were received as fairly representative of the situation as it existed at the time of the collision.

The following witnesses testified on behalf of plaintiff.

George Grazier, a member of the Missouri Highway Patrol, investigated the accident at the scene within a few minutes after the collision. His description of the crossing, the surrounding area, and its condition as to the presence of grass and weeds agrees with that above stated, except that he did not know the condition of the planks between and outside the rails. He testified, on direct examination, that, taking into consideration the existence of the weeds as described, it was his opinion that a person approaching the crossing up this incline in an automobile like plaintiff's decedent was driving could see a train 350 feet north of the crossing. He testified, on cross-examination, that from a point 350 feet north of the crossing a southbound train would not at any point pass out of the view of a driver of an automobile who has turned onto the gravel road and is driving east up this incline toward the tracks; that the weeds would obstruct the view of only a part of a train, that part " * * * probably * * * the height of the wheels or just a little higher * * * ", and " * * * you would still be able to see * * * " the rest of a train. He further testified, on direct examination, that the engineer and fireman told him the train " * * * was whistling * * * " and " * * * the horn and bell were operating * * * ." The witness identified as fairly representing the scene several photographs received in evidence; some of these (defendants' exhibits) show, from different points on the gravel road, a southbound train in plain view at varying distances north of the crossing.

R. A. Dorr, employed as a Railroad Safety Supervisor by the Missouri Public Service Commission, investigated this accident at the scene six days after the accident. His description of the crossing and the surrounding area is essentially the same as that above stated. He testified that the tracks are in " * * * a very slight cut, probably a couple of feet [deep] on the north side * * * " of the crossing; that there is a "bank of earth" north of the gravel road between the tracks and Route B; that the crossing, as indicated by the planks laid lengthwise with the rails, is fifteen feet wide, but that they have broken off to about thirteen feet; that the crossing " * * * would be awful close for two cars" to pass; that there is a group of trees north and east of the crossing; that there were weeds three or four feet high on the bank north of the gravel road between the tracks and Route B. He further testified, on direct examination, that in his opinion " * * * someone in an automobile ap-

proximately 25 feet * * * west of the track going up that incline * * * " could see " * * * a train such as this * * * " 600 or 700 feet north of the crossing; that at 50 feet west of the tracks you could see a train between 200 and 300 feet north of the crossing. This witness took some of the photographs introduced in evidence by plaintiff. On direct examination, he was handed one of these photographs which he identified as being taken from the west edge of Route B approximately 100 feet south of the gravel road, looking north. This photograph shows in the foreground a part of the area south of the gravel road and, in the background, the area north of the road and east of Route B. Looking at this photograph, he testified on direct examination, that "You can see the trains * * * there."

Bob Kline, a Columbia businessman, lives some 500 feet south and east of the crossing; he has used it at least twice daily for four years. He testified that the crossing is not wide enough for two cars to pass; that there are some trees north and east of the crossing; that he was in his home climbing the steps from his basement when he heard an "abnormal" noise that he later decided was the collision of the train and automobile; that the train stopped north of McGee Service Station, with its rear end approximately 1700 feet south of the crossing. He further testified, on direct examination, that he had in the past seen weeds in the condition shown in one of plaintiff's photographs (he said he did not know the height of the weeds on the day of the accident). Asked his opinion as to " * * * how far north you could see a train as you are going up that incline * * *," based on the condition of the weeds as shown in plaintiff's photograph, he said: "Coming off of Route B on to * * * and you have to make an abrupt right turn and then you go straight on up this incline to the tracks. I would say perhaps you could see a train coming * * * of course, it would depend on where you were at on this incline. If you were at the bottom of the incline, the train

would be very close to you before you could see it. If you were centerway or up on top of the tracks, this would be a different matter."

He further testified that he did not hear the train blow a whistle or horn or ring a bell, because his attention was directed to what he was doing at the time and was not listening; that he would not say that a train whistle, horn or bell was or was not sounded, because he did not know.

Pat Akins and her father, Keith Akins, live north and west of the crossing. Their testimony was confined to whether the train sounded a whistle, horn or bell, and was essentially the same as that of Mr. Kline on that subject.

James Gail Aust has lived east of this crossing for thirteen years and has used it at least twice daily for that long. His description of the crossing and the area surrounding it is essentially the same as that above stated. He testified that the crossing is not wide enough for two cars to pass; that an ordinary automobile loaded with people will "drag" on the crossing, unless it is driven slowly and " * * * you hit [the crossing] just about right * * * "; that the weeds north of the crossing were cut after the day of the accident, but that he did not know " * * * how soon * * * afterwards * * *."

M. L. Sheridan, Sr., has lived east of the crossing for over 20 years and uses the crossing daily. He testified that when driving north on Route B " * * * you are running parallel with the tracks, then you've got to make a sharp right turn and go up a steep incline to get over the track. And when your car gets up on the track, your hood's up there, you see, and you can't see * * * another car coming. And, of course, there's a bank on the left hand side and you are down in this little cut too, see, going up on the track, why you're sitting down on the road until you get up there, and if it is muddy, you stop, you have trouble getting started." Asked how close

to the tracks he would have to put the front end of his car to have unimpaired vision to the north, he said: "You practically have to have the front end of your car up on the track."

M. L. Sheridan, Jr., lives near his father and has used the crossing daily for 19 years. He testified that he was at the crossing near 4:30 P.M. on the date of this accident; that he has never passed anyone on that crossing and would not try it; that an automobile will drag going across the crossing, unless " * * * you approach slow and not hit it hard or fast or if you haven't got your car loaded heavy * * *"; that the weeds were mowed " * * * right after that accident * * *"; that the weeds that were mowed later would obscure the view of a southbound train until a person was " * * * up pretty close to the track." Handed one of the exhibits, a photograph of the scene showing a southbound train north of the crossing, he said, the weeds shown in the photograph do not obstruct the view of the train.

Charles T. Bagby, the fireman, testified on behalf of defendants that the "first recollection" he has of seeing the automobile involved in the collision is when the automobile was about ten feet west of the west rail and the front of the engine was about seventy-five feet north of the crossing; that the train's brakes were applied but did not "take hold" until about the time of the impact.

The court said in Lohmann v. Wabash Railroad Co., et al., 364 Mo. 910, 269 S.W. 2d 885, at l.c. 892: "It has long been the rule in this State that a railroad track of itself is a sign and warning of danger requiring one who is approaching and about to cross the track to look and listen for approaching trains before driving thereon. A motor vehicle driver, particularly one familiar with a railroad crossing and about to drive thereover, is required to exercise the highest degree of care to keep a lookout and to observe and watch for the possible approach of trains. If a motor vehicle driver, having a clear view down the railroad track in daylight drives upon the track when by looking could have seen an approaching train, if he obviously failed to look for a train before so driving thereon, is guilty of negligence as a matter of law. [citing] Kelsay v. Mo. Pac. Ry. Co., 129 Mo. 362, loc. cit. 374, 30 S.W. 339, loc. cit. 342, 343 [and other cases]. This Court has long declared that the failure of one approaching a railroad crossing with which he is familiar to see what was plainly visible before his eyes is conclusive evidence of negligence. Time without number this Court has reaffirmed what we held in an early case, that: '"If a traveler, by looking, could have seen an approaching train in time to escape, it will be presumed, in case he is injured by collision, either that he did not look, or, if he did look, that he did not heed what he saw. Such conduct is held negligence per se."' Kelsay v. Mo. Pac. R. Co., supra."

■ We are mindful of the well-known rules: (1) that in determining whether plaintiff's decedent was guilty of contributory negligence plaintiff's evidence must be considered as true and she must be given the benefit of all reasonable inferences and the aid of defendants' evidence favorable to her; and (2) that if reasonable men would honestly differ upon whether Mr. Davenport exercised the highest degree of care in operating his automobile at the time and place mentioned in evidence the issue of his contributory negligence was for the jury. Zumault v. Wabash Railroad Co., Mo., 302 S.W.2d 861, 862–863[2–3]; Willis v. Wabash Railroad Company, Mo.App., 377 S.W.2d 489, 492[1,2].

Plaintiff contends there is no evidence of contributory negligence or, if there is, that issue was properly for the jury. She contends the evidence is that her deceased husband could not have seen the approach of the southbound train until his automobile was on the tracks, too late to avoid the

fatal collision; that high weeds growing on the ground or bank north of the gravel road completely obstructed his view to the north. She also contends, by way of argument, that the group or "clump" of trees north and east of the crossing, shown in several photographs, would, and did, "* * conceal the silhouette of the train."

■ Plaintiff further asserts that there are other factors which must be taken into consideration in determining whether her deceased husband was guilty of contributory negligence as a matter of law. She points to these factors: that he was driving up a steep incline preparing to cross a rough, narrow crossing and make a sharp turn to his right after crossing; that in approaching the crossing the hood of his car obstructed the view of traffic approaching from the east; that the train was running approximately fifty minutes late, and reasonably would not be expected to be at the crossing at this hour; that he had the duty to observe where he was driving as well as keep a lookout for a train. She contends that these factors would distract his attention from the danger of a train at the crossing and would tend to excuse his failure to see it in time to avoid the collision.

■ We agree that these facts and circumstances may be taken into consideration (Zumault v. Wabash Railroad Co., supra, l.c. 866), in determining whether plaintiff's decedent was negligent, and they are. However, under all the facts and circumstances of this case, particularly the physical facts shown by the several photographs in evidence, we find that they would not completely excuse his failure to see and avoid a collision with the clearly visible train. Of course, he had the duty to observe where he was driving, but he was not required or permitted to give his undivided attention to that task while approaching the railroad crossing or ignore the danger of the crossing simply because he would not (we assume) expect a train

at this hour; he had the duty also, in the exercise of the highest degree of care, "* * * to observe and watch for the possible approach of trains * * *" (269 S.W.2d, l.c. 892), to see that which was plainly visible.

Defendants contend that plaintiff's decedent was guilty of negligence as a matter of law in driving his automobile onto the west rail of the track in front of the train under circumstances where he could have seen the train approaching if he had looked. They contend also that the testimony of M. L. Sheridan, Sr., (that "You practically have to have the front end of your car up on the track * * *" to have an unimpaired view to the north.") and M. L. Sheridan, Jr., (that the weeds would obscure the view of a southbound train until one is "* * * up pretty close to the track.") must be disregarded because at variance with the physical facts showing that deceased's view to the north was not obscured and that the train was in plain sight as he approached the crossing.

In Lohmann v. Wabash Railroad Company, supra, the court said, 269 S.W.2d at l.c. 891: "What may be seen from a certain place under admitted or undisputed conditions and circumstances, and the view or line of sight under such circumstances is a physical fact, clearly and unequivocally demonstrable by photographic evidence. And where physical facts speak with a force which overcomes testimony to the contrary, reasonable minds must accept and follow the physical facts and therefore cannot differ. It has long been the rule in this jurisdiction that where testimony is, beyond any reasonable doubt, contrary to established physical facts or laws and facts of common knowledge, it cannot be accepted as substantial evidence. And if the testimony of a witness upon a material issue is inherently impossible, or is so opposed to all reasonable probability as to be manifestly false, the courts are not bound to accept it and will wholly disregard it. (Citing cases.)"

The testimony of the Messrs. Sheridan is obviously opposed to the testimony of other witnesses for plaintiff, and is so contrary to the physical facts shown by the photographs that its rejection is compelled. In rejecting their testimony as contrary to the physical facts we do not weigh the evidence in the judicial sense of that term. Lohmann v. Wabash Railroad Co., supra, l.c. 891. We hold that their testimony does not rise to the dignity of substantial evidence that plaintiff's decedent could not have seen the train until his automobile was on the track.

Plaintiff takes the position, in argument, that the testimony of defendant Bagby (the fireman) supports her contention that her husband could not see the train until his car was on the track, and thus aids her case; that this witness testified he "* * * could not see the car of decedent until [it was] 10 feet from track or 10 feet from train * * *." Therefore, she says, since the fireman could not see the car, her husband could not see the train. This position is based on a false premise; the witness did not so testify. The substance of his testimony is that he had no recollection of having seen the car before it was about ten feet from the west rail; not that he did not see it or that he could not have seen it before then. This evidence does not aid plaintiff.

Plaintiff's evidence and the physical facts demonstrate that it was impossible for her husband to have failed to see the southbound train, if he had looked to the north from almost any point as he was driving toward the crossing. If he had so looked, there is no question but that he could and would have seen the train, stopped his car, and waited for the train to pass over the crossing. He failed to discharge the duty imposed on him by law, and in so failing he was negligent.

Accordingly, the judgment is reversed and the cause remanded with directions that judgment be entered for defendants.

All concur.